IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number:  2012-NMSC-019

Filing Date: June 1, 2012

Docket No. 32,789

BANI CHATTERJEE,

    Petitioner-Petitioner,

v.

TAYA KING,

    Respondent-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Daniel A. Sanchez, District Judge**

Caren I. Friedman
Santa Fe, New Mexico

N. Lynn Perls
Albuquerque, New Mexico

National Center for Lesbian Rights
Shannon P. Minter
Catherine P. Sakimura
San Francisco, California

for Petitioner

Kerri Allensworth
Albuquerque, New Mexico

Atkinson & Kelsey, P.A.
Patrick L. McDaniel
Albuquerque, New Mexico

for Respondent

Southwest Women's Law Center

Dorene A. Kuffer
Kyle M. Stock
Albuquerque, New Mexico

for Amici National Association of Social Workers, New Mexico Chapter of National Association of Social Workers, and Southwest Women's Law Center

Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Bienvenu, LLP
Sarah E. Bennett
Santa Fe, New Mexico

New Mexico Legal Group, P.C.
David G. Crum
Emma L. Whitley
Jessica C. Roth
Martha J. Kaser
Albuquerque, New Mexico

Little, Gilman-Tepper & Batley, P.A.
Sandra Morgan Little
Jan B. Gilman-Tepper
Roberta S. Batley
Tiffany O. Leigh
Albuquerque, New Mexico

Walther Family Law
David L. Walther
Gretchen M. Walther
Kathryn E. Terry
Jennifer R. Rodgers
Albuquerque, New Mexico

for Amici Hollinger, Joslin, & Other Family Law Professors

## OPINION

**CHÁVEZ, Justice.**

{1}     Bani Chatterjee (Chatterjee) and Taya King (King) are two women who were in a committed, long-term domestic relationship when they agreed to bring a child into their relationship.  Chatterjee pleaded in the district court that during the course of their relationship, and with Chatterjee's active participation, King adopted a child (Child) from Russia.  Chatterjee supported King and Child financially, lived in the family home, and co-

parented Child for a number of years before their commitment to each other foundered and they dissolved their relationship. Chatterjee never adopted Child. After they ended their relationship, King moved to Colorado and sought to prevent Chatterjee from having any contact with Child.

**{2}** Chatterjee filed a petition in the district court to establish parentage and determine custody and timesharing (Petition). Chatterjee alleged that she was a presumed natural parent under the former codification of the New Mexico Uniform Parentage Act,[1] NMSA 1978, Section 40-11-3 (1986), Section 40-11-5 (1997), and Section 40-11-21 (1986). She further claimed to be the equitable or de facto parent of Child, and as such, was entitled to relief.[2] In response to Chatterjee's Petition, King filed a motion to dismiss pursuant to Rule 1-012(B) NMRA. In the motion to dismiss, King neither admitted nor denied any of the facts that Chatterjee claimed in her Petition. King instead argued that Chatterjee was a third party who was seeking custody and visitation of Child and that NMSA 1978, Section 40-4-9.1(K) (1999) of the Dissolution of Marriage Act, NMSA 1978, §§ 40-4-1 to -20 (1973, as amended through 2011), prohibits a third party from receiving custody rights absent a showing of unfitness of the natural or adoptive parent. The district court dismissed the Petition for failure to state a claim upon which relief could be granted.

**{3}** Chatterjee then appealed to the Court of Appeals, which affirmed in part, reversed in part, and remanded to the district court. *Chatterjee v. King*, 2011-NMCA-012, ¶ 40, 149 N.M. 625, 253 P.3d 915, *cert. granted*, 2011-NMCERT-001, 150 N.M. 560, 263 P.3d 902. The Court of Appeals held that Chatterjee did not have standing to seek joint custody absent a showing of King's unfitness because she is neither the biological nor the adoptive mother of Child. *Id.* ¶ 29. The Court further held that presumptions establishing a father and child relationship cannot be applied to women, and a mother and child relationship can only be established through biology or adoption. *Id.* ¶¶ 27-29. Judge Vigil, who dissented in the Court of Appeals opinion, believed that Chatterjee had standing to pursue joint custody under the extraordinary circumstances doctrine. *Id.* ¶ 49 (Vigil, J., dissenting). The Court of Appeals reversed the district court's dismissal concerning the opportunity for Chatterjee to seek standing for visitation and remanded to the district court, instructing the district court

---

[1]Uniform Parentage Act, NMSA 1978, §§ 40-11-1 to -23 (1986, as amended through 2004; repealed by Laws 2009, ch. 215, § 19, effective January 1, 2010; recodified as New Mexico Uniform Parentage Act, NMSA 1978, §§ 40-11A-101 to -903 (2010)). This opinion refers to the version of the UPA that was in effect at the time of the original lawsuit. The "hold out provision" discussed at length in this opinion has been limited by the Legislature in the new enactments. *See* § 40-11A-204. The disposition in this case, however, would not be impacted by the limitations.

[2]Because we find that a plain reading of the Uniform Parentage Act gives Chatterjee standing to seek custody, we do not reach her arguments on extraordinary circumstances or constitutionality.

3

to determine whether visitation with Chatterjee would be in Child's best interests. *Id.* ¶¶ 39-40. On remand, the district court appointed a guardian ad litem for Child and accepted the guardian ad litem's recommendation that contact and visitation with Chatterjee would be in Child's best interests.

**{4}**     The question in this case is whether Chatterjee has pleaded sufficient facts in her Petition to give her standing to pursue joint custody of Child under the Dissolution of Marriage Act. Whether Chatterjee has standing to pursue joint custody depends on whether Chatterjee has pleaded facts sufficient to establish that she is an interested party under Section 40-11-21 of the New Mexico Uniform Parentage Act (UPA). Her pleading sets forth facts, which, if true, establish that she has a personal, financial, and custodial relationship with Child and has openly held Child out as her daughter, although she is neither Child's biological nor adoptive mother.

**{5}**     We hold that a natural mother is an interested party who has standing to pursue joint custody of a child. We conclude, based on the facts and circumstances of this case, that the facts pleaded by Chatterjee are sufficient to confer standing on her as a natural mother because (1) the plain language of the UPA instructs courts to apply Section 40-11-5(A)(4), which specifies criteria for establishing a presumption that a man is a natural parent, to women because it is practicable for a woman to hold a child out as her own by, among other things, providing full-time emotional and financial support for the child; (2) commentary by the drafters of the UPA supports application of the provisions related to determining paternity to the determination of maternity;[3] (3) the approach in this opinion is consistent with how courts in other jurisdictions have interpreted their UPAs, which contain language similar to the New Mexico UPA; and (4) New Mexico's public policy is to encourage the support of children, financial and otherwise, by providers willing and able to care for the child.

## I.     SECTION 40-11-21 ESTABLISHES A BASIS FOR STANDING FOR "ANY INTERESTED PARTY."

**{6}**     Chatterjee argues that she has standing to establish parentage as an interested party under Section 40-11-21 of the UPA because she has held Child out as her child pursuant to Section 40-11-5(A)(4). Section 40-11-21 provides that "[a]ny interested party may bring an action to determine the existence or nonexistence of a mother and child relationship. Insofar as practicable, the provisions of the Uniform Parentage Act [40-11-1 NMSA 1978] applicable to the father and child relationship apply."

**{7}**     While there is no case law in New Mexico holding that a person alleging a natural parent relationship under the UPA is per se an interested party, our courts have recognized

---

[3]"Paternity," *see*, *e.g.*, Section 40-11-5, and "maternity" refer to legal determinations of parenthood.

that the Legislature "clearly intended" that the UPA have broad application. In *In re Estate of DeLara*, 2002-NMCA-004, ¶ 13, 131 N.M. 430, 38 P.3d 198, the Court of Appeals concluded that the use of the term "any interested party" in Sections 40-11-7 and 40-11-21, coupled with the extraordinary twenty-one year statute of limitations, Section 40-11-23, indicates the Legislature's intent to apply the UPA broadly. The Court recognized that this reading was in line with New Mexico's strong public policy favoring child support, which is important to both the child and the state. *DeLara*, 2002-NMCA-004, ¶ 13.

**{8}** Moreover, the Court of Appeals has treated the "interested party" standard under the UPA as a fact-sensitive inquiry, considering the particular facts of each case. *See, e.g.*, *Sisneroz v. Polanco*, 1999-NMCA-039, ¶¶ 18, 20, 22, 126 N.M. 779, 975 P.2d 392 (holding that, under the facts of the case, a mother had standing to bring a suit for retroactive child support under the UPA); *State ex rel. Salazar v. Roybal*, 1998-NMCA-093, ¶¶ 3-4, 125 N.M. 471, 963 P.2d 548 (holding that a twenty-year-old adult was an interested party and, until the age of twenty-one, eligible to seek support and a determination of paternity); *Tedford v. Gregory*, 1998-NMCA-067, ¶ 13, 125 N.M. 206, 959 P.2d 540 (same).

**{9}** We agree that a case-by-case analysis is the best way to determine whether an action is appropriate under the UPA. Chatterjee claims that she openly held out Child as her natural child from the moment that she and King brought Child to New Mexico from Russia and therefore that she should be able to establish a parent and child relationship under Section 40-11-5(A)(4), which creates a presumption of paternity. Section 40-11-5(A)(4), which we refer to as the "hold out provision," provides that "[a] man is presumed to be the natural father of a child if . . . he openly holds out the child as his natural child and has established a personal, financial or custodial relationship with the child." Any person who is able to establish presumed natural parenthood under Section 40-11-5(A)(4) would qualify as an interested party. Therefore, we must now determine whether Chatterjee, as a woman, can establish a presumed natural parent and child relationship under Section 40-11-5(A)(4).

## II. THE UPA REQUIRES COURTS TO APPLY PROVISIONS RELATING TO THE FATHER AND CHILD RELATIONSHIP TO WOMEN WHEN IT IS PRACTICABLE TO DO SO.

**{10}** Chatterjee argues that the Court of Appeals erred in holding that none of the UPA provisions relating to the father and child relationship may be applied to women. She claims that this holding directly contradicts the plain language of Section 40-11-21. King responds that the UPA provisions establishing paternity should not be applied to women because the UPA expressly provides the ways in which maternity can be established. We agree with Chatterjee. We find support for Chatterjee's argument not only in the plain language of the statute itself, but also in the purpose of the UPA, the application of paternity provisions to women in jurisdictions with similar UPA provisions, and in public policy that encourages the love and support of children from able and willing parents.

**{11}** "Statutory interpretation is an issue of law, which we review de novo." *N.M. Indus.*

5

*Energy Consumers v. Pub. Regulation Comm'n*, 2007-NMSC-053, ¶ 19, 142 N.M. 533, 168 P.3d 105. When reviewing a statute, our courts aim to effectuate the Legislature's intent in passing the statute. *See id.* ¶ 20. When attempting to determine the Legislature's intent, "[w]e look first to the plain language of the statute, giving the words their ordinary meaning, unless the Legislature indicates a different one was intended." *Id.*

**{12}** In addition to looking at the statute's plain language, we will consider its history and background and how the specific statute fits within the broader statutory scheme. *State v. Rivera*, 2004-NMSC-001, ¶ 13, 134 N.M. 768, 82 P.3d 939. When a statute is ambiguous, this may include an assessment of how its construction implicates public policy. *See State v. Smith*, 2004-NMSC-032, ¶ 10, 136 N.M. 372, 98 P.3d 1022. Because we consider statutes in the context of the broader act in which they are situated, we read them in conjunction with statutes addressing the same subject matter, ensuring a harmonious, common-sense reading. *State v. Muniz*, 2003-NMSC-021, ¶ 14, 134 N.M. 152, 74 P.3d 86, *superseded by statute on other grounds as recognized in State v. Tafoya*, 2010-NMSC-019, ¶ 10, 148 N.M. 391, 237 P.3d 693 *and State v. Jones*, 2010-NMSC-012, ¶ 19, 148 N.M. 1, 229 P.3d 474.

**A.      THE PLAIN LANGUAGE OF SECTIONS 40-11-4(A) AND 40-11-21, READ TOGETHER, REQUIRES THIS COURT TO APPLY THE HOLD OUT PROVISION IN SECTION 40-11-5(A)(4) TO ALLEGED MOTHERS.**

**{13}** We begin our analysis with Section 40-11-2 of the UPA, which states that a "'parent and child relationship' means the legal relationship existing between a child and his natural or adoptive parents incident to which the law confers or imposes rights, privileges, duties and obligations. It includes the mother and child relationship and the father and child relationship." For a mother, Section 40-11-4(A) provides that "the natural mother may be established by proof of her having given birth to the child, *or as provided by Section [40-11-21 NMSA 1978]*." (Emphasis added.) Section 40-11-21 states that "[a]ny interested party may bring an action to determine the existence or nonexistence of a mother and child relationship. Insofar as practicable, the provisions of the Uniform Parentage Act applicable to the father and child relationship apply."

**{14}** The Court of Appeals held that reading Section 40-11-21 to allow Chatterjee to establish parentage through Section 40-11-5(A)(4) was impracticable. *Chatterjee*, 2011-NMCA-012, ¶ 27. The Court also held that reading Section 40-11-5 to apply to women would render Section 40-11-4(A), which provides for how a woman may establish natural motherhood, "'surplusage or meaningless.'" *Chatterjee*, 2011-NMCA-012, ¶ 27 (quoting *Int'l Ass'n of Firefighters v. City of Carlsbad*, 2009-NMCA-097, ¶ 11, 147 N.M. 6, 216 P.3d 256 ("We seek to give meaning to all parts of the statute, such that no portion is rendered surplusage or meaningless.")). It reasoned that the Legislature, in enacting Section 40-11-4(A), created separate sections for how a woman as opposed to a man can prove natural parenthood, implying that it intended each sex to have different means available for proving parenthood. *See Chatterjee*, 2011-NMCA-012, ¶ 27. The Court therefore concluded that applying the means for proving paternity to proving maternity would contravene the

6

Legislature's intent. *See id*. ¶¶ 10, 27. We disagree.

**{15}** It is practicable to apply Section 40-11-5 to determine maternity in certain circumstances. "Practicable" is defined as "reasonably capable of being accomplished; feasible." *Black's Law Dictionary* 1291 (9th ed. 2009). Section 40-11-5(A)(4), which establishes a parental presumption, is reasonably capable of being accomplished by either a man or a woman. Section 40-11-5(A)(4) provides, in relevant part, that "[a] man is presumed to be the natural father of a child if . . . while the child is under the age of majority, he openly holds out the child as his natural child and has established a personal, financial or custodial relationship with the child." Because the presumption is based on a person's conduct, not a biological connection, a woman is capable of holding out a child as her natural child and establishing a personal, financial, or custodial relationship with that child. This is particularly true when, as is alleged in this case, the relationship between the child and both the presumptive and the adoptive parent occurred simultaneously.

**{16}** In addition, by limiting proof of natural motherhood to biology under Section 40-11-4(A), the Court of Appeals renders meaningless the clear instruction in Section 40-11-4(A) that a "natural mother may [also] be established . . . as provided by Section 21 [40-11-21 NMSA 1978]." *See Int'l Ass'n of Firefighters*, 2009-NMCA-097, ¶ 11. A straightforward reading of Section 40-11-4(A) is that motherhood may be established by giving birth, by adoption, and in any other way in which a father and child relationship may be established when it is practicable to do so. Because it is practicable for a woman to hold a child out as her own, the plain language instructs us to recognize that Section 40-11-5(A)(4) relating to the father and child relationship also applies to the mother and child relationship.

**{17}** This interpretation is not only expressly required; it is consistent with our obligation to read related statutes in harmony. *See Smith*, 2004-NMSC-032, ¶ 10. If Section 40-11-4(A) is interpreted as narrowly as the Court of Appeals suggests, all other forms of parentage allowed under the language "or as provided by Section 21 of the Uniform Parentage Act" would not be recognized in New Mexico as valid parent-child relationships. We simply cannot read this language out of the statute.

**{18}** Moreover, we seek to avoid an interpretation of a statute that would raise constitutional concerns. *Lovelace Med. Ctr. v. Mendez*, 111 N.M. 336, 340, 805 P.2d 603, 607 (1991), *reaff'd in State ex rel. Regents of E. N.M. Univ. v. Baca*, 2008-NMSC-047, ¶ 10, 144 N.M. 530, 189 P.3d 663 ("It is, of course, a well-established principle of statutory construction that statutes should be construed, if possible, to avoid constitutional questions." (internal quotation marks and citation omitted)). In *New Mexico Right to Choose/NARAL v. Johnson*, 1999-NMSC-005, ¶ 36, 126 N.M. 788, 975 P.2d 841, we held that classifications based on gender are presumptively unconstitutional. In this case, the Court of Appeals' reading would yield different results for a man than for a woman in precisely the same situation. If this Court interpreted Section 40-11-5(A)(4) as applying only to males, then a man in a same-sex relationship claiming to be a natural parent because he held out a child as his own would have standing simply by virtue of his gender, while a woman in the same

7

position would not. In other words, if two men were in Chatterjee's and King's exact situation, Chatterjee's male counterpart would have standing under Section 40-11-5(A)(4) of the UPA to establish parentage, while Chatterjee would not. We avoid this disparate treatment, giving effect to the Legislature's intent, with a plain and simple application of Section 40-11-5(A)(4) to both men and women under Section 40-11-21.

**B.      THE DRAFTERS OF THE ORIGINAL UPA INTENDED THAT PROVISIONS RELATING TO THE FATHER AND CHILD RELATIONSHIP APPLY TO WOMEN IN APPROPRIATE SITUATIONS.**

**{19}**    The authors of the Uniform Parentage Act of 1973 (the original UPA), anticipating situations such as this case, provided in a comment that masculine terminology was used for the sake of simplicity and not to limit application of its provisions to males. Indeed, the commentary relating to Section 21 of the original UPA, which was adopted by New Mexico in 1986, instructs courts on how to apply Section 21:

> This Section permits the declaration of the mother and child relationship where that is in dispute. Since it is not believed that cases of this nature will arise frequently, Sections 4 to 20 are written principally in terms of the ascertainment of *paternity*. While it is obvious that certain provisions in these Sections would not apply in an action to establish the mother and child relationship, the Committee decided not to burden these—already complex—provisions with references to the ascertainment of *maternity*. In any given case, a judge facing a claim for the determination of the mother and child relationship should have little difficulty deciding which portions of Sections 4 to 20 should be applied.

Unif. Parentage Act § 21 cmt. (1973), *available at* http://www.law.upenn.edu/bll/archives/ulc/fnact99/1990s/upa7390.htm.

**{20}**    There is no indication that our Legislature intended a different reading of this statute in New Mexico when it adopted the original UPA in its entirety, with only minor revisions, in 1986. *Wallis v. Smith*, 2001-NMCA-017, ¶ 9, 130 N.M. 214, 22 P.3d 682. The commentary from the original UPA, together with the explicit instruction given in Section 40-11-21, which provides that the paternity provisions may apply as far as practicable to establish natural motherhood, indicate that the Legislature intended Section 40-11-5(A)(4) to apply to both men and women. Because Section 40-11-21 instructs courts to apply provisions relating to the father and child relationship to mother and child relationships, then Section 40-11-5(A)(4) must also be applied to women.

**C.      OTHER JURISDICTIONS WITH STATUTES VIRTUALLY IDENTICAL TO THE NEW MEXICO UPA HAVE APPLIED PROVISIONS RELATING TO THE FATHER AND CHILD RELATIONSHIP TO MOTHER AND CHILD RELATIONSHIPS.**

**{21}** In *Elisa B. v. Superior Court*, 117 P.3d 660, 666-67 (Cal. 2005), the California Supreme Court held that it is practicable to apply the hold out provision of the California UPA—equivalent to the provision at issue in this case—to women. The district court found that the petitioner was obligated to pay child support under the equitable estoppel theory. *Id*. at 664. The California Court of Appeal reversed the district court, reasoning that California case law, *Johnson v. Calvert*, 851 P.2d 776, 781 (Cal. 1993), which held that a child could not have three natural parents (one father and two mothers), prevented it from recognizing the petitioner as a second parent. *Elisa B.*, 117 P.3d at 665-66. The California Supreme Court reversed the Court of Appeal, holding that the petitioner, the "woman who agreed to raise children with her [same-sex] partner, supported her partner's artificial insemination . . . and received the resulting twin children into her home and held them out as her own, is the children's *parent under the Uniform Parentage Act* and has an obligation to support them." *Id*. at 662 (emphasis added).

**{22}** In coming to this conclusion, the California Supreme Court relied solely on the language of the California UPA,[4] explaining that the Court of Appeal's reliance on *Johnson* was misplaced because that holding had been abrogated by the California domestic partnership statutes. *Elisa B.*, 117 P.3d at 666. The *Elisa B.* court distinguished the matter it declined to support in *Johnson*, recognition of three natural parents in a surrogacy arrangement, from the issue in *Elisa B.*, which was whether a child could have two natural parents, both of whom are women. *See Elisa B.*, 117 P.3d at 666.

**{23}** The *Elisa B.* court did not rely on California's domestic partnership statutes to reach its conclusion. The two women neither registered as domestic partners nor adopted each other's children. *Id*. at 663. The *Elisa B.* court also went to great lengths to explain that, prior to the effective date of the domestic partnership statutes, it had held that a child could have two mothers in a second parent adoption case. *Id*. at 666. *Elisa B.* also recognized that the California Court of Appeal had, prior to the enactment of the domestic partnership statutes, applied the hold out provision of the California UPA to women who were not the biological mothers of the children they held out as their own. *See id*. at 667; *see also In re Salvador M.*, 4 Cal. Rptr. 3d 705, 708 (Cal. Ct. App. 2003) (applying the hold out provision to the child's half-sister because "[t]he paternity presumptions are driven, not by biological paternity, but by the state's interest in the welfare of the child and the integrity of the family")*; In re Karen C.*, 124 Cal. Rptr. 2d 677, 681-82 (Cal. Ct. App. 2002) (finding that

---

[4]King incorrectly interprets the holding of *Elisa B*., claiming that the court's application of the California UPA paternity provision to a woman in that case was "only possible under a recently enacted version of the [California] domestic partnership statutes." Contrary to King's claim, however, the *Elisa B.* court explained that "[a]lthough . . . the UPA contains separate provisions defining who is a mother and who is a father, it expressly provides that in determining the existence of a mother and child relationship, '[i]nsofar as practicable, the provisions of this part applicable to the father and child relationship apply.'" 117 P.3d at 665 (citation omitted).

a woman with no biological connection to a child could be a presumed mother under the hold out provision traditionally applied to fathers).

**{24}** Since *Elisa B.* was decided, California has applied the hold out provision to women in varying factual situations. With a fact pattern similar to the case before us, in *S.Y. v. S.B.*, 134 Cal. Rptr. 3d 1, 7-8 (Cal. Ct. App. 2011), the California Court of Appeal applied the hold out provision of the California UPA in analyzing whether an alleged second mother was a natural parent. The court held that she could establish she was a natural parent because (1) she received the children into her home and held them out as her natural children, (2) she and the adoptive mother were in a committed relationship when the children were adopted, (3) the two women verbally agreed that the second mother would provide for the adoptive mother and their children, and (4) the second mother took time off from work to be present for the birth of one of the children. *S.Y.*, 134 Cal. Rptr. 3d at 8-11. The Court has also applied the hold out provision of the California UPA to a grandmother seeking a determination of parentage, but held that she was not a presumed parent because she had openly held the child out as her grandson, not her son. *In re Bryan D.*, 130 Cal. Rptr. 3d 821, 830-31 (Cal. Ct. App. 2011).

**{25}** The Colorado Court of Appeals has also interpreted the Colorado UPA clause, "[i]nsofar as practicable, the provisions of [the Colorado UPA] applicable to the father and child relationship apply," as enabling language applicable to the paternity provisions relating to women. *In re S.N.V.*, ___ P.3d ___, 2011 WL 6425562 at *2 (Colo. App. 2011) (second alteration in original) (internal quotation marks and citation omitted). A dispute arose between the biological mother and the wife of the biological father as to who was the legal mother of the child. *Id.*, ___ P.3d at ___, 2011 WL 6425562 at *1. The biological mother claimed that the child was conceived in a consensual relationship with the biological father. *Id.* The wife claimed that she and her husband had a surrogacy arrangement with the biological mother. *Id.* The wife filed an action under the Colorado UPA to establish the parentage of the child. *Id.* The court held that an action to determine legal maternity "may be brought by any woman who is presumed to be the child's mother under [Colo. Rev. Stat.] Section 19-4-105 [(2008)]"—the equivalent of Section 40-11-5 of the New Mexico UPA—which provides paternity presumptions. *See In re S.N.V.*, ___ P.3d at ___, 2011 WL 6425562 at *2.

**{26}** The *In re S.N.V.* court based its holding on three provisions of the Colorado UPA, including Colo. Rev. Stat. Section 19-4-122 (1987)—the identical equivalent of Section 40-11-21 of the New Mexico UPA—which states that "[a]ny interested party may bring an action to determine the existence . . . of a mother and child relationship. Insofar as practicable, the provisions of this article [of the Colorado UPA] applicable to the father and child relationship apply." ___ P.3d at ___, 2011 WL 6425562 at *2. Using this language, the court held that, in that situation, the wife could establish a presumption of maternity

based on marriage or on holding out the child as her natural child,[5] and bolstered its holding with Colo. Rev. Stat. Section 19-4-125 (1987), which provides that, when appropriate, "the word 'father' shall mean 'mother.'" *In re S.N.V.*, ___ P.3d at ___, 2011 WL 6425562 at *2.

{27}    The Oregon Court of Appeals has also applied statutes establishing parentage presumptions based on marital status to women. *Shineovich & Kemp*, 214 P.3d 29, 39-40 (Or. Ct. App. 2009). Although this case dealt with a parentage presumption arising from artificial insemination, it presented essentially the same issue facing this Court: whether a statute creating a presumption of parentage written in terms of paternity should be applied to similarly situated women.

{28}    In *Shineovich*, the Oregon Court of Appeals held that a statute recognizing a husband's parentage based on his consent to assisted reproduction was unconstitutional unless it was equally applied to women in same-sex relationships who consent to their partners' inseminations. *Id*. at 39-40. The court in *Shineovich* analyzed two statutes that were being challenged on the grounds that applying parentage presumptions simply on the basis of marriage was discriminatory. *Id*. at 33-34. The challenger was a woman who could not be in a legally-recognized marriage with her former same-sex partner because Oregon did not recognize same-sex marriage. *Id*. at 32-33. However, the challenger functioned as the child's co-parent from birth until the couple's relationship ended. *Id*. at 32. The biological mother, who was the challenger's former partner, argued that even given this alleged parent and child relationship, the statutes could not provide relief because the challenger had not consented in writing to the insemination. *Id*. at 37.

{29}    The court held that the statute was unconstitutional because it did not require that there be at least the possibility of a biological relationship with the child. *Id*. at 39. In other words, all it required was conduct that indicated an intent to parent. The statute simply creates a presumption that the consenting husband of an artificially inseminated woman is the child's legal parent, regardless of biological connection. *See id*. The court held that the Oregon statute that provided standing was unconstitutional as applied because there was no compelling justification to deny same-sex couples the right to enjoy that presumption. *Id*. at 40. Therefore, the court extended the presumption to similarly situated women.[6] *Id*.

---

[5]Colorado's statutes creating those presumptions are virtually identical to New Mexico's. *See* § 40-11-5(A)(1), (4) ("A man is presumed to be the natural father of a child if: (1) he and the child's natural mother are or have been married to each other and the child is born during the marriage . . .; [or] (4) while the child is under the age of majority, he openly holds out the child as his natural child and has established a personal, financial or custodial relationship with the child.").

[6]King contends that *Shineovich* is inapposite, arguing that the statute that gave the challenger standing was not found in the Oregon UPA but under the Oregon Family Fairness Act, which provides domestic partners with the same rights as married couples. However,

11

**D.     PUBLIC POLICY STRONGLY SUPPORTS APPLYING SECTION 40-11-5(A)(4) TO WOMEN.**

**{30}**    The New Jersey Superior Court reached the same conclusion that the *Shineovich* court reached in a case involving similar facts, *In re Parentage of Robinson*, 890 A.2d 1036 (N.J. Super. Ct. Ch. Div. 2005), *abrogated by In re T.J.S.*, 16 A.3d 386, 396 (N.J. Super. Ct. 2011) (distinguishing *Robinson* on the facts, but opining, in dicta, that *Robinson* was in error for "relying upon the [child's] 'best interest' standard in deciding the issue of parentage"). However, the rationale for that holding was more policy-based.  In *Robinson*, a same-sex couple that was still together wanted an adjudication of parentage from the court for the non-biological mother.  *Id*. at 1037.  The couple raised their petition in the context of challenging the presumption of parentage afforded to husbands of artificially-inseminated wives.  *Id*.

**{31}**    In finding that the presumption of parentage should be extended to a same-sex partner who consents to a biological mother's artificial insemination, the court made certain observations that we find persuasive.  First, the court recognized that parents have an obligation to support their children "in any possible combination and permutation of marriage . . . , method for conception of the child, and arrangements that intended parents make to have children. *Otherwise we have children for whom nobody has responsibility. . . . It is necessary law for the new century.*"  *Id*. at 1039-40 (internal quotation marks and citation omitted).  Next, the court provided information from the 2000 United States Census, which revealed that "[t]he average American family (generally thought to be mom, dad and two children) applies, in fact, to only 23.5% of the American population, a decrease from 45% in 1960."  *Id*. at 1040.  Therefore, the court reasoned, "[i]t is in the State's best interest to insure that parents are identifiable" because the responsibility of caring for the children falls directly to citizenry of the state if the parents do not bear financial responsibility.  *Id*. at 1039 (internal quotation marks and citation omitted); *see id.* at 1042.

**{32}**    As the New Jersey Superior Court recognized in *Robinson*, the state has a strong interest in ensuring that a child will be cared for, financially and otherwise, by two parents.  *Id.* at 1039, 1042.  If that care is lacking, the state will ultimately assume the responsibility of caring for the child.  This is one of the primary reasons that the original UPA was created, and it makes little sense to read the statute without keeping this overarching legislative goal in mind.  *See* Unif. Parentage Act Prefatory Note (1973) ("[I]t is expected that this Act will fulfill an important social need in terms of improving the states' systems of support enforcement.").

---

the statute is not a provision in the Oregon Family Fairness Act but rather is found in Oregon's domestic relations statutes, and uses language substantially similar to the artificial insemination provision of the New Mexico UPA.  The Oregon statute that provided standing in *Shineovich* is found in Title 11 (Domestic Relations) of Chapter 109 (Parent and Child Rights and Relationships), at Section 109.243 (Artificial Insemination).  The Oregon Family Fairness Act, in contrast, is found in Or. Rev. Stat. 106.300 to 106.340.

**{33}** The original UPA was also written to address the interest that children have in their own support. The rationale underlying the original UPA is that every child should be treated equally, regardless of the marital status of the child's parents. *See* Unif. Parentage Act § 2, § 2 cmt. (1973). In deciding illegitimacy cases, the United States Supreme Court recognized that it is "illogical and unjust" for a state to deny a child's essential right to be supported by two parents simply because the child's parents are not married. *Gomez v. Perez*, 409 U.S. 535, 538 (1973) (internal quotation marks and citation omitted). The Court also noted, regarding irresponsible parenthood, that "no child is responsible for his [or her] birth and penalizing the illegitimate child is an ineffectual . . . way of deterring the parent." *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175 (1972). With this in mind, we see no reason for children to be penalized because of the decisions that their parents make, legal or otherwise. *See Plyler v. Doe*, 457 U.S. 202, 220, 223-24, 230 (1982) (holding that it is improper to create an underclass of children who are held responsible for the illegal actions of their parents because the children could "affect neither their parents' conduct nor their own status" (internal quotation marks and citation omitted)).

**{34}** Consistent with the underlying policy-based rationale of the New Mexico UPA that equality in child welfare requires laws that achieve equality in parentage, Child's need for love and support is no less critical simply because her second parent also happens to be a woman. Experts in child psychology recognize that sometimes the law is too limiting when it comes to actually addressing what is in the child's best interests. The attachment bonds that form between a child and a parent are formed regardless of a biological or legal connection. *See* Joseph Goldstein et al., *Beyond the Best Interests of the Child* 27 (rev. ed. 1979). These bonds are formed as a result of "provision of physical and emotional care, continuity or consistency in the child's life, and emotional investment in the child." Nat'l Research Council & Inst. of Med., *From Neurons to Neighborhoods: The Science of Early Childhood Development* 234-35 (Jack P. Shonkoff & Deborah A. Phillips eds., 2000). The law needs to address traditional expectations in light of current realities to keep up with the changing demographic of American families and to protect the children born into them.

**{35}** Indeed, New Mexico courts have long recognized that children may form parent-child bonds with persons other than their legal parents. This Court has previously recognized that a grandfather could be awarded custody over a biological father's objections. *See Cook v. Brownlee*, 54 N.M. 227, 228-29, 220 P.2d 378, 378-79 (1950). We have also held that a trial court had the power to award custody to an uncle with whom a child had bonded over the biological mother's objection, even absent the mother's unfitness. *See Ex parte Pra*, 34 N.M. 587, 588, 590-91, 286 P. 828, 828, 829-30 (1930).

**{36}** Additionally, the New Mexico Court of Appeals has already embraced the idea of a child having two mothers in appropriate situations. In *A.C. v. C.B.*, 113 N.M. 581, 585, 829 P.2d 660, 664 (Ct. App. 1992), the Court of Appeals held that a "[p]etitioner's sexual orientation, standing alone, is not a permissible basis for the denial of shared custody or

13

visitation."[7]  In *Barnae v. Barnae*, 1997-NMCA-077, ¶ 10, 123 N.M. 583, 943 P.2d 1036, the Court of Appeals again recognized a lesbian partner's standing to assert a legal right to a continuing relationship with a child.  As such, Chatterjee should not be disqualified from being a presumed parent simply because she is a woman.

{37}    It is inappropriate to deny Chatterjee the opportunity to establish parentage, when denying Chatterjee this opportunity would only serve to harm both Child and the state.  In our view, it is against public policy to deny parental rights and responsibilities based solely on the sex of either or both of the parents.  The better view is to recognize that the child's best interests are served when intending parents physically, emotionally, and financially support the child from the time the child comes into their lives.  This is especially true when both parents are able and willing to care for the child.  Therefore, we hold that the Legislature intended that Section 40-11-5(A)(4) be applied to a woman who is seeking to establish a natural parent and child relationship with a child whom she has held out as her natural child from the moment the child came into the lives of both the adoptive mother and the presumptive mother.

### III.    THIS IS NOT AN APPROPRIATE ACTION IN WHICH TO REBUT THE PRESUMPTION OF NATURAL PARENTHOOD BECAUSE "NATURAL" AND "BIOLOGICAL" ARE NOT SYNONYMOUS TERMS AS USED IN THE NEW MEXICO UPA.

{38}    It is undisputed in this case that Chatterjee is neither the biological mother nor the adoptive mother of Child.  Regardless of the parties' agreement to co-parent Child, the Court of Appeals considered this issue and concluded that only biological and adoptive mothers have standing to seek custody.  *See Chatterjee*, 2011-NMCA-012, ¶¶ 27-29.  The Court of Appeals relied on *Black's Law Dictionary* to interpret the term "natural mother" in Section 40-11-4(A) of the New Mexico UPA as synonymous with both "birth mother" and "biological mother."  *Chatterjee*, 2011-NMCA-012, ¶ 29.   However, resorting to the dictionary is unnecessary when the Legislature itself has set forth the criteria for determining whether a woman is a natural mother.  The Legislature did not limit the analysis to the simple question of whether the woman is the "birth mother."  Had the Legislature intended to do so, Section 40-11-4(A) would read only "the natural mother may be established by proof of her having given birth to the child."  Instead, the Legislature provided an alternative for establishing the existence of a "natural mother"—referring to Section 40-11-21, which leads to testing the presumptions given in Section 40-11-5 against the facts.

{39}    Had the Legislature intended to equate "natural mother" with "birth mother" or "biological mother," it would have said so.  In other related contexts, the Legislature has

---

[7]Because the second mother in *A.C.* claimed to have a custody agreement with the other legal mother, the Court of Appeals analyzed the case under the parties' agreement and not under the UPA.  *Id*. at 583-84, 829 P.2d at 662-63.

defined a parent as the "biological or adoptive parent." For example, the Legislature defines a "parent," in relevant part, as "a biological or adoptive parent" in the Children's Code. NMSA 1978, § 32A-1-4(P) (2009). The history of Section 32A-1-4(P) is additional proof that the Legislature distinguishes between a "natural" and a "biological" parent. In 1994 the word "parent" was defined to "include[] a *natural* or adoptive parent." (Emphasis added.) In 1995 the Legislature replaced the word "natural" with the word "biological." *Compare* § 32A-1-4(P) (2009), *with* § 32A-1-4(O) (2005). If, as posited by the Court of Appeals, the Legislature equates the word "natural" with "biological," there would have been no need for the Legislature to amend the definition of "parent" in 1995. Thus, if the Legislature, for purposes of the UPA, intended that "natural" motherhood could only be proved through a biological connection, then it would have used the term "biological" as it did in the Children's Code.

**{40}** The mischief that is created when a court resorts to a dictionary to define a term that is already defined in a statute is illustrated when we define "natural father" by referring to *Black's Law Dictionary*.[8] At "natural father," *Black's* instructs the reader to "[s]ee *biological father*." *Black's Law Dictionary*, *supra*, at 1126. *Black's* defines "biological father" as "[t]he man whose sperm impregnated the child's biological mother." *Id.* at 682. Although impregnating a woman with sperm is one way for a man to be presumed to be the child's "natural father" under the UPA, Section 40-11-5 of the UPA lists several alternative criteria by which a man can be presumed to be the child's "natural father."[9]

**{41}** We recognize that presumptions under Section 40-11-5 may be rebutted by clear and convincing evidence. *See* § 40-11-5(C); *see also Lane v. Lane*, 1996-NMCA-023, ¶ 10, 121 N.M. 414, 912 P.2d 290 (concluding that any presumption in that case was automatically rebutted by a showing of a husband's sterility but ultimately recognizing the non-biological father as the natural father). However, the presumption of parentage should only be rebutted *in an appropriate action*. *See* § 40-11-5(C).

**{42}** Our Legislature has not defined "appropriate action," but sister jurisdictions with similar UPA provisions are instructive. In *In re Nicholas H.*, 46 P.3d 932 (Cal. 2002), the California Supreme Court held that a presumed father's admission that he was not the child's biological father did not necessarily rebut the presumption of fatherhood that arose by receiving the child into his home and openly holding out the child as his own. *Id.* at 937, 941. The court held that it was inappropriate to rebut the presumption when there was no

---

[8]We interpret "identical words used in different parts of the same act [as having] the same meaning." *State v. Jade G.*, 2007-NMSC-010, ¶ 28, 141 N.M. 284, 154 P.3d 659 (alteration in original) (internal quotation marks and citation omitted).

[9]Section 40-11-6(A) also provides that the husband of his artificially-inseminated wife is the natural father of the child thereby conceived, regardless of the fact that there is no possibility that the husband is the biological father.

other man claiming parental rights and because denying the presumed father's claim would leave the child fatherless. *Id.* at 941. However, the court was careful not to suggest that every man who begins living with a woman who is pregnant or who has a child or children automatically becomes a presumed father simply by virtue of those facts, even against his wishes. *Elisa B.*, 117 P.3d at 670; *see Nicholas H.*, 46 P.3d at 940. The California Supreme Court has since opined that "[t]he Legislature surely did not intend to punish a man like the one in *Nicholas H.* who voluntarily provides support for a child who was conceived before he met the mother, by transforming that act of kindness into a legal obligation." *Elisa B.*, 117 P.3d at 670. Nonetheless, we agree with the California Supreme Court that the legislature, by using the phrase "*in an appropriate action*," limited the circumstances for rebuttal of the parentage presumption. *Nicholas H.*, 46 P.3d at 936 (internal quotation marks and citation omitted).

{43}     The California Supreme Court also considered the appropriateness of rebutting the presumption of parenthood in *Elisa B.*, 117 P.3d at 669. The court upheld the presumption, despite clear and convincing evidence that the petitioner was not the biological mother of the children, for three reasons. First, the court concluded that this was not an appropriate action in which to rebut the presumption "because she actively participated in causing the children to be conceived with the understanding that she would raise the children as her own together with the birth mother." *Id.* at 670. Second, the petitioner voluntarily expressed an intention to accept the responsibilities and enjoy the benefits of parenthood together with her partner from before the children were conceived through the first years of the children's lives. *Id.* Finally, there was no competition from any other person claiming to be the children's second parent. *Id.* Allowing rebuttal of the presumption in that case would have left the children without the support of a second parent, and that responsibility would ultimately fall to the county if the petitioner did not assume it. *Id.*

{44}     Colorado also considers the appropriateness of the action before allowing an action rebutting a presumption to move forward. In *In re A.D.*, 240 P.3d 488 (Colo. App. 2010), the Colorado Court of Appeals held that the case was not an appropriate action in which to rebut the presumption because the presumptive father and the child "shared a preexisting bond of love and affection" and "the child would face possible trauma if she lost all contact with him." *Id.* at 490. The mother argued that the statutory definition of a "parent and child relationship" automatically precluded the man from presumptive father status because he was neither the biological nor the adoptive father. *Id.* at 491. The mother did not challenge the sufficiency of the evidence that the presumed father and her child had established a parent and child relationship, but contended that he was precluded by the words of the statute alone. *Id.* In rejecting the mother's argument, the Colorado Court of Appeals concluded that the Colorado UPA "does not elevate the presumption of biology over the presumption of legitimacy" and "nothing in the statutory provisions . . . provides that an admission by a man . . . that he is not the child's biological father conclusively rebuts [a parentage] presumption." *Id.*

{45}     The Washington Supreme Court similarly considers the appropriateness of the

16

rebuttal action, focusing on the best interests of the child. *See McDaniels v. Carlson*, 738 P.2d 254, 262 (Wash. 1987) (en banc) (announcing a four-factor, best-interests-of-the-child test to apply when the court is faced with a paternity challenge from "outside the present family").

**{46}**     Likewise in New Mexico, biology does not exclusively determine who is a "natural parent," whether that person is male or female, under the New Mexico UPA. Indeed, in *Tedford*, 1998-NMCA-067, ¶ 15, the Court of Appeals recognized the importance of considering the child's best interests when making a paternity determination. The Court articulated the best-interests-of-the-child standard as follows:

> [T]he trial court does not automatically assume that a [biological] paternity determination is in the best interest of the child. Where a child is young and has already established a close emotional bond with the presumed father, and where the trial court determines that it would be detrimental to the child's welfare to compromise the continuity of that established relationship, the court will not determine paternity solely on the basis of a biological relationship between the child and the putative father.

*Id*.

**{47}**     Because we do not reach the merits of this case, we do not decide whether the district court action in which Chatterjee would seek to establish parentage would be an appropriate court proceeding in which to rebut her presumption of parentage, if indeed she is able to establish the presumption. We do, however, find persuasive the factors considered by courts in California, Colorado, and Washington.

## IV.     CHATTERJEE IS AN "INTERESTED PARTY" AS DEFINED BY THE NEW MEXICO UPA, AND THEREFORE SHE HAS STANDING TO ESTABLISH A PARENT AND CHILD RELATIONSHIP.

**{48}**     When considering whether a complaint states a cause of action, we "accept as true all facts well pleaded." *C & H Constr. & Paving, Inc. v. Found. Reserve Ins. Co.*, 85 N.M. 374, 376, 512 P.2d 947, 949 (1973) (internal quotation marks and citation omitted). Chatterjee asserted facts below sufficient to establish that she is an interested party because her allegations satisfy the hold out provision of Section 40-11-5(A)(4). In her complaint, Chatterjee alleged that she and King were in a committed relationship from 1993 to 2008; she traveled with King to Russia to adopt Child during that relationship in 2000; she has openly held Child out to the world as her daughter ever since Child arrived in New Mexico from Russia; Child believes that Chatterjee is her parent; Child lived with both Chatterjee and King in the same house from May 2000 through August 2008; and Chatterjee provided financial and emotional support to both King and Child throughout this time period. These allegations satisfy a presumption of natural motherhood by applying Section 40-11-5(A)(4), and neither party disputes that a presumptive natural mother qualifies as an "interested party" under Section 40-11-21.

17

**{49}** The fact that Chatterjee did not adopt Child does not impact our decision. Section 40-11-5 of the New Mexico UPA delineates the ways in which parentage can be presumed. Thus, our Legislature has recognized that there will be many situations in which someone is caring for a child but has not taken any steps to legalize that relationship. While taking legal action is the best way to ensure that both the alleged parent and the child have rights arising from that relationship, both our Legislature and this Court have indicated a willingness to confer rights to relationships that have not been legally established. This is so because parental rights are not automatically conferred when there is a biological relationship, but rather when an alleged parent has taken the responsibility of caring for a child. *See Helen G. v. Mark J.H. (In re Adoption Petition of Bobby Antonio R.)*, 2008-NMSC-002, ¶ 44, 143 N.M. 246, 175 P.3d 914. Considering the specific facts of this case, we hold that Chatterjee has alleged sufficient facts to attempt to establish that she is an interested party, and therefore she has standing to establish parentage under Section 40-11-21 of the New Mexico UPA.

## V.    NATURAL PARENTS HAVE STANDING TO SEEK CUSTODY UNDER THE DISSOLUTION OF MARRIAGE ACT, REGARDLESS OF THE FITNESS OF ANOTHER PARENT.

**{50}** Regarding joint custody, the Court of Appeals held that, since Chatterjee could not establish a natural mother and child relationship under the New Mexico UPA, she therefore could not seek custody under the Dissolution of Marriage Act absent a showing of King's unfitness. *See Chatterjee*, 2011-NMCA-012, ¶¶ 13-15, 22, 24; *see also* § 40-4-9.1(K) ("When any person other than a natural or adoptive parent seeks custody of a child, no such person shall be awarded custody absent a showing of unfitness of the natural or adoptive parent."). However, as discussed above, Section 40-11-5(A)(4) is applicable to women attempting to establish a parent and child relationship because it is practicable to do so. Therefore, if Chatterjee is able to establish a parent and child relationship under the New Mexico UPA, she will then have standing as a natural parent to seek joint custody of Child under the Dissolution of Marriage Act. *See Roth v. Bookert (In re Adoption of J.J.B.)*, 119 N.M. 638, 652, 894 P.2d 994, 1008 (1995) (the public policy of New Mexico regarding custody matters is secured in Section 40-4-9.1(K) and should be applied "when a family breaks up"); *see also Grant v. Cumiford*, 2005-NMCA-058, ¶¶ 2, 13, 137 N.M. 485, 112 P.3d 1142 (applying Section 40-4-9.1 in determining a custody dispute, even though the parties were never married).

**{51}** Our courts have recognized a parental preference doctrine when determining custody as against the government and third parties. *Shorty v. Scott*, 87 N.M. 490, 493, 535 P.2d 1341, 1344 (1975); *see also Brito v. Brito*, 110 N.M. 276, 279, 794 P.2d 1205, 1208 (Ct. App. 1990) ("[I]n a custody contest between a parent and a non-parent who has no legal right to custody, the natural parent has preference over a non-parent."). However, the parental preference doctrine does not apply between two parents in a custody dispute. *See Shorty*, 87 N.M. at 493, 535 P.2d at 1344; *Brito*, 110 N.M. at 279, 794 P.2d at 1208. As we have explained in detail, our holding gives Chatterjee the opportunity to seek joint custody as a

18

natural parent, assuming that her allegations of the parent and child relationship she has with Child are true. Therefore, the parental preference doctrine would not apply in this case.

## VI. CONCLUSION.

**{52}** Chatterjee has standing to bring an action to establish a parent and child relationship with Child pursuant to Section 40-11-21 because she has alleged sufficient facts to establish that she is a presumed natural parent under Section 40-11-5(A)(4). Assuming that all of her allegations are true, Chatterjee would then have standing to seek joint custody as a natural parent under Section 40-4-9.1 of the Dissolution of Marriage Act. We reverse the Court of Appeals and remand this case to the district court for further proceedings consistent with this opinion.

**{53}    IT IS SO ORDERED.**

_____
**EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Chief Justice**

_____
**PATRICIO M. SERNA, Justice**

_____
**CHARLES W. DANIELS, Justice**

**RICHARD C. BOSSON, Justice, specially concurring**

**BOSSON, Justice (specially concurring).**

**{54}** I agree with the outcome reached by the majority, but on narrower grounds. I write out of concern that this Opinion might be interpreted to expand the population of presumed parents in a manner that would shake settled expectations of custody rights and child support responsibilities. If interpreted narrowly, the majority Opinion applies existing law to evolving, contemporary fact patterns, which is a good thing. If interpreted broadly, however, the majority Opinion could be read to impose seismic changes in custody and child support relationships that neither the New Mexico Uniform Parentage Act (UPA), NMSA 1978, §§ 40-11-1 to -23 (1986, as amended through 2004), nor sound policy authorizes, at least not in my judgment.

**{55}** The majority Opinion holds that Chatterjee has standing to pursue shared custody of

19

Child because the presumptions of paternity listed in Section 40-11-5 of the applicable UPA apply equally to women as presumptions of maternity when practicable. *See supra* ¶¶ 5-6, 10-37. In order to reach this conclusion, I believe we need to address other questions that do not hinge upon Chatterjee's gender. *First, when is a nonadoptive, nonbiological individual a presumed parent under the holding-out provision of the UPA? Then, when does biology (the lack of a biological relationship) rebut such a presumption of parentage?*

**{56}** Without answering these questions, the majority Opinion concludes that Chatterjee has standing to pursue custody because "[h]er pleading sets forth facts, which, if true, establish that she has a personal, financial, and custodial relationship with Child and has openly held Child out as her daughter, although she is neither Child's biological nor adoptive mother." *See supra* ¶ 4. But is concluding that Chatterjee has openly held out Child as her daughter the end of the inquiry? Not in my opinion.

**{57}** Let me explain my concerns through a hypothetical. Suppose a hypothetical Mother has two children with men who are no longer involved in their lives for whatever reason, including death. Eventually, Mother begins a serious relationship with a hypothetical Man who moves in and lives happily with Mother and her two young children. Man assists in financial aspects of the household, which almost automatically includes expenses that support the children. At times he refers to himself as the children's father, for example in conversations with neighbors, perhaps on school documents and so forth, either for convenience purposes or perhaps because he truly does wish to become the children's father. Mother may or may not know that Man refers to himself in this way, but we will assume she does. Mother actively considers the possibility of marriage and that some day Man might adopt her two children.

**{58}** After a few years, however, the relationship sours, and Mother asks Man to leave. It is over. But Man decides he does not want it to end entirely; he wants to share legal custody over the two children. Perhaps his motives are pure; perhaps he is just vindictive and extortionate. Whatever the motive, he alleges standing as a presumed father who has held out the children as his "own" and has established a financial, personal, and custodial relationship with them. He files in court and, as a presumed father, demands a full-blown custody hearing to prove his merits. The best interests of the children, he argues, require his presence in their lives, and Mother, whether out of spite or sincerity, is not acting in a manner consistent with those best interests. Mother finds herself in a custody battle to retain control over her own children.

**{59}** A claim of presumed parenthood can be equally abused in the other direction. Perhaps Man chooses to end the relationship, never really interested in custody over the children. But it is the Mother who demands permanent child support from him, alleging that Man has become, however reluctantly, a presumed father by virtue of his holding out.

**{60}** Neither of these scenarios strikes me as desirable from a policy point of view. They appear to run counter to conventional expectations among both professionals and the public

20

at large. After all, the Mother in my hypothetical, completely fit as a parent, has never agreed to surrender her custodial rights to anyone. Should my hypothetical Man even have standing to pursue his claim? According to my reading of the UPA, such claims veer far outside the essential intent and structure of the statute. Yet we need to be careful, lest the majority Opinion be read to lay a legal basis for such claims.

**{61}** The majority Opinion is not clear what facts Chatterjee has alleged sufficient to establish that she openly held out Child as her own. Therefore, it is also not clear whether hypothetical Man, like Chatterjee, would have standing to pursue custody as a "presumed parent" under the holding-out provision. I believe Chatterjee's situation is distinct, and I write to explain why. Without this clarification and resulting narrowing of the Opinion, I fear the consequences of my hypothetical. As explained earlier, I fear that Man could force Mother to defend her sole custody rights in court, leaving the ultimate determination to a best-interests analysis by a judge, and only after prolonged, highly expensive, and totally unnecessary litigation. And, to make matters worse, if Man has deeper pockets than Mother, he might well win.

**{62}** The majority states that "New Mexico courts have long recognized that children may form parent-child bonds with persons other than their legal parents."[10] *Supra ¶ 35.* While I do not disagree, the point seems irrelevant, unless everything boils down to a "best interests" determination. For most of this Court's history, "the primary purpose of paternity suits [was] to insure the putative father meets his obligation to help support the child." *Aldridge ex rel. Aldridge v. Mims*, 118 N.M. 661, 665, 884 P.2d 817, 821 (Ct. App. 1994) (citing *State ex rel. Human Servs. v. Aguirre*, 110 N.M. 528, 530, 797 P.2d 317, 319 (Ct. App. 1990)); *see also In re Estate of DeLara*, 2002-NMCA-004, ¶ 10, 131 N.M. 430, 38 P.3d 198 ("The primary purpose of a paternity proceeding is to compel the father to support his child. Our Supreme Court has characterized child support as a parent's most important single

---

[10]The majority's assertion that this Court "held that a trial court had the power to award custody to an uncle with whom a child had bonded over the biological mother's objection, even absent the mother's unfitness" is not supported by our precedent. *See supra* ¶ 35 (citing *Ex parte Pra*, 34 N.M. 587, 588, 590-91, 286 P. 828, 828, 829-30 (1930)). The mother in *Ex parte Pra* was unfit; she had abandoned her one-month-old child, leaving him with the uncle, and then she neglected the child for nine years. *Ex Parte Pra*, 34 N.M. at 588-89, 286 P. at 829. We clarified that narrow holding in *Shorty v. Scott.* In *Scott* we recognized that the mother in *Ex Parte Pra* "was impliedly found unfit in the overall sense since she had effectively abandoned her child when he was but one month old and totally neglected him for nine years." 87 N.M. 490, 494 n.8, 535 P.2d 1341, 1345 n.8 (1975). The majority also cites *Cook v. Brownlee,* 54 N.M. 227, 228-29, 220 P.2d 378, 378-79 (1950) as an example of this Court favoring parent-child bonds over biological relationships. *See supra* ¶ 35. In that case, we awarded custody to a grandfather over a biological father's objections, but only because the biological father had abandoned his child. *Cook*, 54 N.M. at 228-29, 220 P.2d at 378-79.

21

obligation. . . . . The state also has an interest in children being supported by their father. Our law reflects a strong public policy in favor of support. We interpret the UPA against this backdrop." (internal quotation marks and citations omitted)).

**{63}** In fact, there is only one prior New Mexico case in which a litigant cited the UPA as the basis for establishing parentage and thus, for standing to gain custody rights *for* a presumed father as opposed to child support *from* one. *See Lane v. Lane,* 1996-NMCA-023, ¶ 10, 121 N.M. 414, 912 P.2d 290. All other New Mexico cases apply the UPA to establish paternity in the child support context or in the context of paternal grandparents seeking visitation rights. And, as we shall see, the putative father in *Lane* was not successful under the holding-out provisions of the UPA. *Id.* ¶ 11. Given this limited history, this case poses questions of first impression regarding the UPA for which we truly do not have precedent. While it is self-evident that Chatterjee should have the same rights as a similarly-situated male, the more basic question asks whether and under what circumstances should such a male have standing to be considered a presumed natural parent under the Act.

**{64}** We have certain traditional legal avenues for asserting parental rights over nonbiological children, primarily through adoption. Adoption can be complicated but, at the very least, it has a set legal protocol. It alerts everyone concerned, just like executing a will, of the solemnity of the occasion and its permanent consequences. "[T]here are advantages to the formality of court-approved adoption pursuant to statute. The formality of the occasion impresses upon those involved the importance of making a considered decision. To predicate an adoption on simply the existence of a loving relationship may often produce results contrary to the intent of those involved." *Otero v. City of Albuquerque*, 1998-NMCA-137, ¶ 15, 125 N.M. 770, 965 P.2d 354 (citations omitted)).

**{65}** We should be wary of interpreting statutes in a way that would dilute the need for such formality, relying instead upon the more ambiguous standard of "best interests." Thus, legal parenthood by holding out should generally track the requirements for legal descendance by holding out, also known as "equitable adoption," which is construed narrowly, *see Poncho v. Bowdoin*, 2006-NMCA-013, ¶¶ 19-36, 138 N.M. 857, 126 P.3d 1221 (rejecting a biological father's argument that another man had equitably adopted his son, made in order to avoid paying child support). The *least* needed for an equitable adoption is that "'acts or omissions induced the child to believe that [the child] was the foster parent's biological or formally adopted child.'" *Otero*, 1998-NMCA-137, ¶ 6 (quoting Jan Ellen Rein, *Relatives by Blood, Adoption, and Association: Who Should Get What and Why*, 37 Vand. L. Rev. 711, 767 (1984)).

**Presumed Parenthood Under the "Openly Holds Out" Presumption**

**{66}** Section 40-11-5 of the UPA lists circumstances under which a man should be presumed to be the "natural father" of a child, including the "openly holds out" provision. While I believe that the term "natural" generally means *biological*, the "presumptions of paternity" are just presumptions. Thus, to be a *presumed* natural father, one need not be an

actual biological father. The UPA anticipates that there may be multiple presumed fathers, foreclosing the possibility that all presumed natural fathers are biologically related to a child. *See* § 40-11-5(B) ("If two or more men are presumed under this section to be the child's father, an acknowledgment by one of them may be effective only with the written consent of the other or pursuant to Subsection C of this section."). Thus, I agree with the majority that we are not precluded from considering Chatterjee a presumed parent on the basis of biology alone. Unfortunately though, biology would also not preclude my hypothetical Man from asserting a "presumed father" status—which I submit most observers would agree is not a good thing—unless we examine more closely what it takes to qualify as a "holding out" parent. I now turn to that question.

**{67}** The holding out provision under Section 40-11-5(A)(4) requires that "[a man] openly holds out the child as his natural child and has established a personal, financial or custodial relationship with the child." Although,"natural" in the context of "natural child," again, likely means biological in most cases, the provision does not require an assertion of, or an actual, biological relationship. It just requires that a presumed parent *hold a child out* as a natural child, meaning treating the child in the same way that a person would treat his or her biological child. Whether Chatterjee can allege that she has established a personal, financial, or custodial relationship with Child is not yet at issue. Whether Chatterjee "openly held out [Child] as [her] natural child," and exactly what that means, definitely is at issue. So too, is what my hypothetical Man should be required to allege by way of holding out before he could gain "presumed natural parent" status under the UPA and force hypothetical Mother to defend her sole custody status in court.

**{68}** Cases from our own Court of Appeals as well as from California jurisprudence illustrate at least three common themes that define holding out a child as one's natural child. In each, the presumed parent (1) acted as a parent from the time the child was born or adopted; (2) assumed ongoing responsibilities to the child through legal and financial declarations; and (3) was recognized by the child's family, including another parent or the child, as the child's parent. This strikes me as a narrower class of presumed parents and significantly so, one that might just deter hypothetical Man from pursuit of custody.

**{69}** "[T]he purpose behind the presumed parent designation . . . 'is to distinguish between those fathers who have entered into some familial relationship with the mother and child and those who have not.'" *S.Y. v. S.B.*, 134 Cal. Rptr. 3d 1, 11-12 (Dist. Ct. App. 2011) (quoting *In re Sabrina H.*, 217 Cal. App. 3d 702, 708 ( Dist. Ct. App. 1990)). A party acts as a parent from birth or adoption when, for example, he "enjoy[s] regular visitation with each child since birth," *Mintz v. Zoernig*, 2008-NMCA-162, ¶ 11, 145 N.M. 362, 198 P.3d 861, he treats the child as his own from the child's birth until years later when the mother no longer permits it, *Lane*, 1996-NMCA-023, ¶¶ 5-7, or he lives with the child from the child's birth until the baby is 22 months old and supports the child and mother financially with earnings until the mother no longer permits it, *Librers v. Black*, 28 Cal. Rptr. 3d 188, 190 (Dist. Ct. App. 2005).

**{70}**     A party assumes ongoing responsibilities through legal or financial declarations, for example, when he asserts his visitation rights in court, acknowledges that he is the natural father of children in a stipulated order, and is registered as the father with the vital statistics bureau. *See Mintz*, 2008-NMCA-162, ¶ 11. Or, he does so when he appears on a child's birth certificate and lists the child as a child of the marriage in divorce document. *See Lane*, 1996-NMCA-023, ¶ 6. Or, he does so when he signs a voluntary declaration of paternity so that he could provide the child with medical and other benefits. *See Librers*, 28 Cal. Rptr. 3d at 190. A party is recognized as a parent by another parent and by the child when, for example, he along with his wife tells family and friends that a child is his and his wife encouraged him to be an active parent, *Lane*, 1996-NMCA-023, ¶ 5, when the child calls him "Da Da," *Librers*, 28 Cal. Rptr. 3d at 190, when the child believes he is her biological father due to both her parents' behavior and assertions, *Lane*, 1996-NMCA-023, ¶ 3, or when he is asked, and agrees, to be *the* male role model in the children's lives and is the only other parent the children have known, *see Mintz*, 2008-NMCA-162.

**{71}**     In *S.Y.*, the California case with facts most similar to Chatterjee's allegations, a host of factors led to the reviewing court's conclusion that a woman held two adopted children out as her natural children under the UPA holding-out provision. 134 Cal. Rptr. 3d at 11. The woman acted as a parent from the time the children were adopted until her partner refused to allow her to do so. *Id.* She acted as a parent by telling her partner, with whom she had a committed relationship, that she would support the partner and co-parent a child when her partner sought to conceive and then adopt; she then assisted with the children's care, finances and activities, and allowed her partner to use her middle name as part of one of the children's names. *Id.* The woman assumed ongoing financial obligations by naming the children as beneficiaries on "everything." *Id.* The children and the woman's partner recognized the woman as the children's mother by giving her Mother's Day cards year-after-year, and by participating in a ceremony typically only attended by family members. *Id.* In addition, the woman's parents considered and treated the children as their grandchildren in terms of shared time and financial savings. *Id.*

**{72}**     Chatterjee's allegations are likewise sufficient to establish that she held Child out as her natural child. Chatterjee acted as a co-parent to Child for many years and until King refused to allow her to do so. Like the woman in *S.Y.*, Chatterjee was in a committed relationship with King when, together, they brought Child into their home. Chatterjee and King brought Child to the United States from Russia, with the intention Child would have two mothers. The only reason King's, and not Chatterjee's, name appeared on the adoption papers was their mutual agreement not to risk complications from Russian law and custom in regard to same-sex adoption and Chatterjee's ethnic origin. Child went by a combined surname, including Chatterjee's last name. Chatterjee assumed ongoing obligations by naming Child as a dependent on her health insurance plan and retirement plan. Child and King referred to Chatterjee as Child's mother. Chatterjee and King told others that Chatterjee was Child's mother. Comparatively, Chatterjee alleges more facts than the woman in *S.Y.*; Chatterjee held out Child as her own in the same way that King held out Child as her own from the time Child came into their lives and until King terminated

24

Chatterjee's visits with Child.

**{73}** Under this high standard for "hold[ing] out," my hypothetical Man rightfully would have a difficult case to allege, much less prove, that he was a "presumed natural parent." In the hypothetical, Man was not involved in bringing Mother's children into the household, unlike Chatterjee who helped create the essential familial relationship. The children would not use or have Man's name. Man may or may not have listed the children formally on any legal documents as his own or as dependents in any formalized manner. It is not clear what role the children or the children's Mother would have considered hypothetical Man to have. To even come close to presumed parent status, Man must not just prove, but he must initially allege such facts. Hypothetical Man would have to make clear whether the children or Mother represented Man to others as the children's father, and in what context, or whether anyone else in the children's family would have believed Man to be the children's father. There would have to be evidence and allegations that hypothetical Man had assumed ongoing financial or legal obligations for the children.

**{74}** Absent most of the foregoing, I do not believe that hypothetical Man could even allege that he has held himself out as a presumed natural parent. Thus, unlike Chatterjee, he would not have standing under the UPA, thereby avoiding the seismic shift in settled legal expectations that I outlined at the beginning of this discussion. Similarly, hypothetical Mother could not seek child support from hypothetical Man under the holding-out provision. All this follows, and justly so, as long as we take a disciplined view of what it really takes to become a presumed natural parent.

**{75}** My narrow view of what it means to be a presumed natural parent by holding out draws support from subsequent modifications to the UPA. The modern UPA drafters had similar concerns. They addressed those concerns explicitly when they amended the model UPA in 2002, although it does not provide for situations in which a child is adopted. The new model UPA, adopted in 2002, and the present-day UPA, adopted in 2009, amend the presumption of fatherhood so that it applies only to persons who, for "*the first two years of the child's life, reside[s] . . . in the same household with the child and openly h[olds] out the child as [his or her] own*." UPA § 704 (1973); *accord* NMSA 1978, § 40-11A-704 (2009) (emphasis added). The comments explaining this change state that

> [b]ecause there was no time frame specified in the 1973 act, the language fostered uncertainty about whether the presumption could arise if the receipt of the child into the man's home occurred for a short time or took place long after the child's birth. To more fully serve the goal of treating nonmarital and marital children equally, the "holding out" presumption is restored, subject to an express durational requirement that the man reside with the child for the first two years of the child's life.

UPA § 704.

**{76}** While we cannot rely solely on statutory amendments to the New Mexico UPA that occurred after the events of this case, the amendment does afford some indication of the correct policy envisioned by our Legislature. I believe our Legislature intended from the beginning that the holding-out provision should apply narrowly to the very creation of the family unit and not loosely to a subsequent relationship formed years later.

### Rebutting the Presumption of Parenthood

**{77}** When should a court rebut a presumption of parentage based on holding out? We have never addressed this question, but several years ago our Court of Appeals did, perhaps precipitously, in *Lane*, 1996-NMCA-023. In *Lane*, evidence that the presumed father was *not* the biological father was held to rebut a presumption of natural parentage based on holding out. *Id.* ¶ 10. The UPA directs, however, that a presumption of natural parenthood "may" be rebutted in an "appropriate action," suggesting a less mechanical approach. *See* § 40-11-5(C).

**{78}** Long before the UPA, courts grappled with when to allow evidence of biology to interfere with established familial units.

> The presumption of legitimacy was a fundamental principle of the common law. Traditionally, that presumption could be rebutted only by proof that a husband was incapable of procreation or had had no access to his wife during the relevant period. As explained by Blackstone, nonaccess could only be proved "if the husband be out of the kingdom of England (or, as the law somewhat loosely phrases it, extra *quatuor maria* [beyond the four seas]) for above nine months . . . ." And, under the common law both in England and here, "neither husband nor wife [could] be a witness to prove access or nonaccess." The primary policy rationale underlying the common law's severe restrictions on rebuttal of the presumption appears to have been an aversion to declaring children illegitimate, thereby depriving them of rights of inheritance and succession, and likely making them wards of the state. A secondary policy concern was the interest in promoting the "peace and tranquillity of States and families," a goal that is obviously impaired by facilitating suits against husband and wife asserting that their children are illegitimate. Even though, as bastardy laws became less harsh, "[j]udges in both [England and the United States] gradually widened the acceptable range of evidence that could be offered by spouses, and placed restraints on the 'four seas rule' . . . [,] the law retained a strong bias against ruling the children of married women illegitimate.

*Michael H. v. Gerald D.*, 491 U.S. 110, 124-25 (1989), *rehearing denied*, 492 U.S. 937, *and superseded by statute as stated in Jones v. Trojak*, 586 A.2d 397 (Pa. Super. Ct. 1990) (citations omitted).

26

**{79}** The majority asserts that "the Court of Appeals recognized the importance of considering the child's best interest when making a paternity determination" in *Tedford v. Gregory*, 1998-NMCA-067, 125 N.M. 206, 959 P.2d 540. *See supra* ¶ 46. To clarify, *Tedford* recognized that a child's best interests is a *factor in determining whether to rebut a presumption of natural parentage* in some jurisdictions, once a presumption of paternity is established. 1998-NMCA-067, ¶ 15. This means that, *before* best interests becomes part of the paternity analysis, a parent must establish presumed parenthood, such as through the holding-out provision of the UPA. For example, if a biological father challenges another presumed parent's relationship after a child has established a father-child relationship with the presumed father, then a court would be justified in not permitting biology to rebut the presumption. *See Tedford*, 1998-NMCA-067, ¶ 15. This is because "when the child involved in such proceeding is a minor and has developed a close emotional attachment to the presumed parents . . . court recognition of another parent would be emotionally or otherwise damaging to the child." *Id.* ¶ 17. *Tedford* recognized that a best interests of the child theory should apply to protect a child from losing a parent, rather than to protect a parent from payment of child support. *Id.* ¶ 18.

**{80}** This *Tedford* dicta closely tracks the reasoning employed in California cases, such as *In re Raphael P.*, 118 Cal. Rptr. 2d 610 (Dist. Ct. App. 2002). *In re Raphael P.* held that when there are "competing claims of would-be parents who wished to raise the child," then "[f]ollowing the biological tie did not deprive the child of a parent." *Id.* at 623. As such, a biological determination of parenthood was appropriate. Conversely, determining parenthood through biology would be inappropriate if a finding of a biological tie would override an existing familial relationship. *Id.* at 624. The court noted that the UPA provisions describing genetic and blood tests refer to testing "alleged" fathers, not "presumed fathers," suggesting that biology should not generally rebut presumed parenthood. *Id.* at 625.

**{81}** The California Supreme Court applied this reasoning most famously in *In re Nicholas H.*, when an admittedly nonbiological, presumed father sought custody of a boy whose mother was not able or willing to care for him and no other man claimed fatherhood. 46 P.3d 932, 934 (Cal. 2002). The California Supreme Court reasoned that the case was not the "*appropriate action*" for rebuttal of a parental presumption: "the Legislature is unlikely to have had in mind an action like this—an action in which no other man claims parental rights to the child, an action in which rebuttal of the [statutory] presumption will render the child fatherless." *Id.* at 941.

**{82}** California courts have continued to apply this logic, not permitting biology to rebut a parental presumption based on holding out, in diverse scenarios. *See, e.g.*, *Elisa B. v. Superior Ct.*, 117 P.3d 660 (Cal. 2005); *Librers*, 28 Cal. Rptr. 3d 188. In *Librers*, the trial court rebutted a boyfriend's presumption of fatherhood because he was not biologically related to a child. *Librers*, 28 Cal. Rptr. 3d at 194. The trial judge had worried that recognizing boyfriend as a presumed father would mean that any custodial male of a child could make a claim of presumed fatherhood. *Id.* at 193. In overturning the trial court's

27

position, the appellate court agreed that, if a custodial male *truly held the child out as his own*, such situations were possible: "a boyfriend, uncle or housemate who . . . holds the child out as his own is not disqualified from asserting parental rights and responsibilities to the child by virtue of his lack of a biological attachment." *Id.* Significantly, in *Librers* the boyfriend alleged that he had acted as the father in every way since the child's birth until the mother refused to let him do so. *Id.* Likewise, in *Elisa B.*, a woman could not use biology to rebut the presumption that she was a natural mother of her former partner's children who were conceived by invitro-fertilization once facts established the presumption under the UPA's holding out provision. 117 P.3d at 670.

**{83}** The bottom line is that a presumption of parentage based on holding out, once properly asserted, is a strong presumption only rebutted in limited circumstances. The new model UPA and modern UPA resolve the issue of rebuttal explicitly, in a way that I believe reflects this case law and the policy behind it. A court may deny genetic testing if "(1) the conduct of the mother or the presumed or acknowledged father *estops* that party from denying parentage; and (2) it would be inequitable to disprove the father-child relationship between the child and the presumed or acknowledged father." NMSA 1978, § 40-11A-608(A)(1) and (2) (2009). Then, nine factors provide guidance as to whether to grant a motion for genetic testing:

> (1) the length of time between the proceeding to adjudicate parentage and the time that the presumed or acknowledged father was placed on notice that he might not be the genetic father;

> (2) the length of time during which the presumed or acknowledged father has assumed the role of father of the child;

> (3) the facts surrounding the presumed or acknowledged father's discovery of his possible nonpaternity;

> (4) the nature of the relationship between the child and the presumed or acknowledged father;

> (5) the age of the child;

> (6) the harm that may result to the child if presumed or acknowledged paternity is successfully disproved;

> (7) the nature of the relationship between the child and any alleged father;

> (8) the extent to which the passage of time reduces the chances of establishing the paternity of another man and a child-support obligation in favor of the child; and

28

(9) other factors that may affect the equities arising from the disruption of the father-child relationship between the child and the presumed or acknowledged father or the chance of other harm to the child.

Section 40-11A-608(B)(1) to (9). Many factors would apply in a future case like Chatterjee's and would weigh against rebutting her presumption of parentage with genetic testing. *See* § 40-11A-608(B)(2), (4), (5), (6) & (9).

**{84}** Given the foregoing reasoning, biological evidence should not rebut Chatterjee's presumption of parentage because doing so would deprive Child of a parent. Hypothetical Man or hypothetical Mother, on the other hand, cannot establish the parental presumption in relation to hypothetical Man, and therefore, he would have no presumptive parental status to rebut. Thus, while Chatterjee should have standing to pursue custody of Child, hypothetical Man would not, nor could hypothetical Mother force him to pay child support.

_____

**RICHARD C. BOSSON, Justice**

**Topic Index**

**APPEAL AND ERROR**
Standard of Review

**CHILDREN**
Custody
Uniform Parentage Act

**CIVIL RIGHTS**
Sex Discrimination

**CIVIL PROCEDURE**
Standing

**DOMESTIC RELATIONS**
Adoption
Child Custody
Child Custody Jurisdiction
Visitation Rights

**STATUTES**
Interpretation
Legislative Intent