**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2014-NMCA-046**

**Filing Date: July 31, 2013**

**Docket No. 31,690 (consolidated with No. 31,668)**

**INTERNATIONAL CHIROPRACTORS ASSOCIATION,**

      **Plaintiff-Appellant,**

**v.**

**NEW MEXICO BOARD OF CHIROPRACTIC EXAMINERS,**

      **Defendant-Appellee,**

**and**

**NEW MEXICO BOARD OF PHARMACY and NEW MEXICO MEDICAL BOARD,**

      **Plaintiffs-Appellants,**

**v.**

**NEW MEXICO BOARD OF CHIROPRACTIC EXAMINERS,**

      **Defendant-Appellee.**

**Direct Appeal from Rulemaking by the New Mexico Board of Chiropractic Examiners**

Cuddy & McCarthy LLP
Charles V. Garcia
Albuquerque, NM
Patrick Ortiz
Santa Fe, NM

Swankin & Turner
James S. Turner, Esq.

1

Washington, D.C.

for Appellant International Chiropractors Association

Gary K. King, Attorney General
Zachary A. Shandler, Assistant Attorney General
Santa Fe, NM

for Appellee New Mexico Board of Chiropractic Examiners

Odin, Feldman & Pittleman, P.C.
Thomas R. Daly
Reston, VA

Sutin, Thayer & Browne
Susan M. Hapka
Albuquerque, NM

for *Amicus Curiae*, American Chiropractic Association

Gary K. King, Attorney General
Daniel R. Rubin, Special Assistant Attorney General
Santa Fe, NM
Mary H. Smith, Assistant Attorney General
Albuquerque, NM

for Appellants New Mexico Board of Pharmacy and New Mexico Medical Board

**OPINION**

**WECHSLER, Judge.**

**{1}**     This appeal is taken under the Uniform Licensing Act, NMSA 1978, §§ 61-1-1 to -34 (1957, as amended through 2013), to challenge rules adopted by Appellee, the New Mexico Board of Chiropractic Examiners (the Chiropractic Board).  The rules in question approve an amended advanced practice chiropractic formulary that includes minerals and additional drugs to be administered by injection (2011 formulary) and a new rule establishing additional educational requirements for advanced practice chiropractic physicians (training rule).  Appellants, the New Mexico Board of Pharmacy (the Pharmacy Board), the New Mexico Medical Board (the Medical Board), and the International Chiropractors Association (the ICA), challenge the 2011 formulary, asserting that it violates the requirement of NMSA 1978, Section 61-4-9.2(B) (2009) of the Chiropractic Physician Practice Act, NMSA 1978, §§ 61-4-1 to -17 (1968, as amended through 2009), that prior approval of the Pharmacy Board and the Medical Board be obtained.  The ICA also challenges the training rule,

2

arguing that it lacked the necessary prior approval of the Medical Board. We hold that the 2011 formulary that includes minerals and additional drugs to be administered by injection violates Section 61-4-9.2(B)'s requirement that the formula receive approval from the Pharmacy Board and the Medical Board. We find no fault with the training rule. Accordingly, we set aside the 2011 formulary.

**BACKGROUND**

**{2}** A certified "advanced practice chiropractic" physician has "prescriptive authority for therapeutic and diagnostic purposes." Section 61-4-9.1; 16.4.15.7(B) NMAC (7/23/2010). The Chiropractic Board has the statutory obligation to approve formularies for substances to be administered by certified advanced practice chiropractic physicians. Section 61-4-9.2(B). A formulary is a listing of the approved substances and includes the manner in which they may be administered. 16.4.15.11 NMAC (11/13/2011). Formularies are embodied under a rule of the Chiropractic Board. *Id.* A formulary that includes "[d]angerous drugs or controlled substances, drugs for administration by injection and substances not listed in Subsection A of" Section 61-4-9.2 requires prior submission to the Pharmacy Board and the Medical Board for approval. Section 61-4-9.2(B).

**{3}** Effective September 11, 2009, the Chiropractic Board adopted an administrative rule establishing an advanced practice chiropractic formulary. This 2009 formulary was the subject of prior litigation between the parties. After the voluntary dismissal of its appeal to this Court, the Pharmacy Board gave its approval for certain substances, and the manner for their administration, to be included in the formulary. The Chiropractic Board decided to amend the formulary proposed in 2009 with the 2010 formulary that was effective July 23, 2010. On July 29, 2011, the Chiropractic Board issued notice that it would hold a hearing and regular meeting to consider various items, including changes to the 2010 formulary. The proposed formulary (2011 formulary) included an amendment to the 2010 formulary, 16.4.15.11 NMAC (07/23/2010), to include minerals and additional drugs to be administered by injection and a new rule, 16.4.15.12 NMAC (11/13/2011), establishing additional educational requirements for certified advanced practice chiropractic physicians that was not approved by the Medical Board.

**{4}** The Chiropractic Board did not submit its proposed 2011 formulary to the Pharmacy Board or the Medical Board prior to the August 30, 2011 hearing. In connection with the hearing, both boards advised the Chiropractic Board that they did not approve the 2011 formulary. The ICA also objected to the 2011 formulary as well as the training rule. The Chiropractic Board approved the 2011 formulary that amended 16.4.15.11 NMAC and the new language of 16.4.15.12 NMAC. The Pharmacy Board and the Medical Board filed a single appeal from the Chiropractic Board's action, and the ICA filed a separate appeal. This Court consolidated the appeals and granted a stay of the two administrative rules pending the resolution of this appeal.

**ARGUMENTS OF THE PARTIES**

**{5}** In this appeal, the Pharmacy and Medical Boards and the ICA contend that the 2011 formulary, 16.4.15.11 NMAC, is contrary to law because the Chiropractic Board adopted it without approval of the Pharmacy and Medical Boards, as required by Section 61-4-9.2(B). The ICA additionally argues that the Chiropractic Board's own regulations required it to obtain the approval of the Pharmacy and Medical Boards before approving the 2011 formulary. It further contends that the training rule, 16.4.15.12 NMAC, violates Section 61-4-9.1(D) and 16.4.15.10(C) NMAC (3/31/2009) because the Medical Board did not approve the new training requirements.

**{6}** The Chiropractic Board counters that its 2011 formulary does not require approval of the Pharmacy and Medical Boards based on its interpretation of Section 61-4-9.2(B) that construes the plain meaning of the statutory language, avoids surplusage, and complies with proper re-punctuation. It argues that its interpretation of Section 61-4-9.2 does not result in any conflict with its regulations. It further contends that the Medical Board was not required to approve the training rule.

**STANDARD OF REVIEW**

**{7}** In an appeal of the adoption of a regulation under the Uniform Licensing Act, this Court may set aside the regulation only if it finds the regulation to be: "(1) arbitrary, capricious or an abuse of discretion; (2) contrary to law; or (3) against the clear weight of substantial evidence of the record." Section 61-1-31(C). The arguments in this appeal raise the question of whether the 2011 formulary and the training rule are contrary to law. Our interpretation of the relevant statutes and administrative rules and regulations is also a question of law. *See PC Carter Co. v. Miller*, 2011-NMCA-052, ¶ 11, 149 N.M. 660, 253 P.3d 950. We review the Chiropractic Board's application of the law de novo. *See id.*

**THE 2011 FORMULARY**

**{8}** "An administrative agency has no power to create a rule or regulation that is not in harmony with its statutory authority." *Rivas v. Bd. of Cosmetologists*, 1984-NMSC-076, ¶ 3, 101 N.M. 592, 686 P.2d 934. The statutory authority at issue is contained in Section 61-4-9.2, which states that:

> A. A certified advanced practice chiropractic physician may prescribe, administer and dispense herbal medicines, homeopathic medicines, over-the-counter drugs, vitamins, minerals, enzymes, glandular products, protomorphogens, live cell products, gerovital, amino acids, dietary supplements, foods for special dietary use, bioidentical hormones, sterile water, sterile saline, sarapin or its generic, caffeine, procaine, oxygen, epinephrine and vapocoolants.

> B. A formulary that includes all substances listed in Subsection A of this section, including compounded preparations for topical and oral

4

administration, shall be developed and approved by the board. A formulary for injection that includes the substances in Subsection A of this section that are within the scope of practice of the certified advanced practice chiropractic physician shall be developed and approved by the board. Dangerous drugs or controlled substances, drugs for administration by injection and substances not listed in Subsection A of this section shall be submitted to the [Pharmacy Board] and the [Medical Board] for approval.

**{9}** The central issue before us concerns the meaning of the third sentence of Section 61-4-9.2(B) as to the circumstances under which approval of the Pharmacy and Medical Boards is required. We thus seek to interpret Section 61-4-9.2 to establish the Legislature's intent in enacting the statute. *See Bd. of Educ. for Carlsbad Mun. Sch. v. N.M. State Dep't of Pub. Educ.*, 1999-NMCA-156, ¶ 16, 128 N.M. 398, 993 P.2d 112 ("The primary purpose of statutory interpretation is to ascertain and give effect to legislative intent." (internal quotation marks and citation omitted)). As the Chiropractic Board points out, this Court refers to the canons of statutory construction to interpret statutory meaning. *Janet v. Marshall*, 2013-NMCA-037, ¶ 9, 296 P.3d 1253. The Chiropractic Board specifically requests that we interpret Section 61-4-9.2 based on three such canons: that a statute should be interpreted in accordance with its plain meaning, *see Janet*, 2013-NMCA-037, ¶ 9; that a statute should be interpreted to give effect to its entire language such that no language is surplusage, *see Benny v. Moberg Welding*, 2007-NMCA-124, ¶ 8, 142 N.M. 501, 167 P.3d 949; and that a court may re-punctuate a sentence to fulfill the legislative intent. *See City of Roswell v. Hall*, 1941-NMSC-011, ¶ 4, 45 N.M. 116, 112 P.2d 505.

**{10}** We address each of the Chiropractic Board's arguments. However, we believe that the Legislature's intent is best resolved by looking to the language of Section 61-4-9.2 in the context of "its history and background" and the manner in which it "fits within the broader statutory scheme." *Chatterjee v. King*, 2012-NMSC-019, ¶ 12, 280 P.3d 283. In this regard, we examine Section 61-4-9.2 in conjunction with statutes that address the same subject matter in order to ensure "a harmonious, common-sense reading." *Chatterjee*, 2012-NMSC-019, ¶ 12.

**History and Background of Section 61-4-9.2**

**{11}** In 2008, the Legislature amended the Chiropractic Physician Practice Act. Among the amendments, the Legislature for the first time authorized the Chiropractic Board to establish by rule an advanced chiropractic practice physician certification registry. Section 61-4-9.1. The Legislature distinguished an advanced chiropractic practice physician from other chiropractors. It permitted an advanced chiropractic practice physician to "have prescriptive authority for therapeutic and diagnostic purposes as authorized by statute" and included within this authority the ability to administer "a drug by injection." *Id.*; Section 61-4-2(C). With this distinctive authority, the Legislature required that an advanced chiropractic practice physician be licensed and certified by a nationally-recognized credentialing agency, have completed three years of post-graduate clinical practice or

5

equivalent clinical experience and annual continuing education, and have "completed a minimum of ninety clinical and didactic contact course hours in pharmacology, pharmacognosy, medication administration and toxicology certified by an examination from an institution of higher education approved by the [Chiropractic Board] and the [Medical Board]." Section 61-4-9.1(D).

**{12}**   With the creation of the advanced chiropractic practice physician status in 2008, the Legislature also required the Chiropractic Board to develop a formulary to address advanced practice chiropractic physicians' prescribing, administering, and dispensing and further required that the formulary be approved by the Pharmacy and Medical Boards. Section 61-4-9.2 (2008). The Legislature additionally required coordination between regulatory boards by mandating joint approval of the Chiropractic and Medical Boards of higher education requirements. Section 61-4-9.1(D).

**{13}**   The Legislature's authority to enact the Chiropractic Physician Practice Act stems from its exercise of the state's power to regulate for the protection of the health, safety, and welfare of its citizens. *See State ex rel. Dep't of Pub. Safety, State Police Div. v. One 1986 Peterbilt Tractor, Black in Color, with an Altered VIN*, 1997-NMCA-050, ¶ 15, 123 N.M. 387, 940 P.2d 1182 ("The [L]egislature is the proper branch of government to determine what should be proscribed under the police power, and a determination of what is reasonably necessary for the preservation of the health, safety and welfare of the general public is a legislative function." (alteration, internal quotation marks, and citation omitted)). Although the Legislature did not include a specific purpose provision in the Chiropractic Physician Practice Act, it did mandate that the Chiropractic Board establish educational requirements "for the purpose of protecting the health and well-being of the citizens of this state." Section 61-4-3(G). The statutes forming the Pharmacy and Medical Boards specifically state the purpose of the statutes as within the state's police power. *See* NMSA 1978, § 61-11-1.1(B) (1997) ("The purpose of the Pharmacy Act is to promote, preserve and protect the public health, safety and welfare[.]"); NMSA 1978, § 61-6-1(B) (2003) (stating the purpose of the Medical Practice Act to be "[i]n the interest of the public health, safety and welfare").

**Plain Meaning of Section 61-4-9.2**

**{14}**   The Chiropractic Board makes two arguments concerning the plain meaning of Section 61-4-9.2. In its answer brief, it raises an argument that draws upon the original language of Section 61-4-9.2 as enacted by the Legislature in 2008. That language read:

> A certified advanced practice chiropractic physician may prescribe, administer and dispense herbal medicines, homeopathic medicines, vitamins, minerals, enzymes, glandular products, naturally derived substances, protomorphogens, live cell products, gerovital, amino acids, dietary supplements, foods for special dietary use, bioidentical hormones, sterile water, sterile saline, sarapin or its generic, caffeine, procaine, oxygen, epinephrine and vapocoolants. A formulary shall be developed by the board

6

and approved by the [Medical Board] and the [Pharmacy Board].

Section 61-4-9.2 (2008).

**{15}**    The Chiropractic Board's plain meaning interpretation of Section 61-4-9.2 raised in its brief focuses on the first two sentences of Subsection B.  According to the Chiropractic Board, the first sentence plainly authorizes it to adopt a formulary allowing an advanced practice chiropractic physician to prescribe and administer a substance listed in Subsection A.  With its amendment to Section 61-4-9.2 in 2009, the Legislature removed from Subsection A the language requiring Pharmacy and Medical Board approval.  Thus, to the Chiropractic Board, under the plain meaning of the first sentence of Subsection B, the Pharmacy and Medical Boards do not need to approve the formulary.  *See N.M. Cattle Growers' Ass'n v. N.M. Water Quality Control Comm'n*, 2013-NMCA-046, ¶ 8, 299 P.3d 436 ("The law of statutory construction presumes that when the Legislature amends a statute, it intends to change the existing law."), *cert. granted*, 2013-NMCERT-003, 300 P.3d 1181.

**{16}**    The Chiropractic Board similarly analyzes the plain meaning of the second sentence of Subsection B.  It reads this sentence to permit it to adopt a formulary allowing an advanced practice chiropractic physician to administer by injection a substance listed in Subsection A if it ensures that such formulary is consistent with the scope of practice of an advanced practice chiropractic physician.  Again, because the second sentence of Subsection B does not contain language requiring that the Pharmacy and Medical Boards approve such formulary, the Chiropractic Board does not consider such approval to be within the plain meaning of Subsection B.

**{17}**    By its own account, the Chiropractic Board's plain meaning interpretation of Section 61-4-9.2 raised in its brief does not address the third sentence of Subsection B.  And it is the meaning of the third sentence that is the crux of the issue before us.  Indeed, the language of this sentence indicates a legislative intent to require Pharmacy and Medical Board approval for the use of certain drugs and substances by an advanced practice chiropractic physician.  The question is which drugs or substances are subject to the required approvals.

**{18}**    The Chiropractic Board raised an alternative argument at oral argument to this Court.  It argued that the plain meaning of the third sentence of Section 61-4-9.2(B) is reflected in the Legislature's reference to "substances in Subsection A" in the first and second sentences.  According to the Chiropractic Board, the Legislature's use of the language "substances listed in Subsection A" in connection with its requirement that the Chiropractic Board develop formularies in the first two sentences indicates that when the Legislature required Pharmacy and Medical Board approval in the third sentence of Subsection B for "substances not listed in Subsection A," it plainly meant to exclude substances listed in Subsection A from the required approval.

**{19}**    In addressing these arguments, we note the interchangeable use of "drug" and "substance" in the Chiropractic Physician Practice Act.  Section 61-4-9.2(B) refers to the

"substances" listed in Subsection A.  But Subsection A includes "over-the-counter drugs."  The third sentence of Subsection B uses the terms "[d]angerous drugs," "controlled substances," "drugs for administration by injection," and "substances not listed in Subsection A."  Section 61-4-9.2(B).  The definitions section of the Chiropractic Physician Practice Act defines "chiropractic" in part by including "the administering of a drug by injection by a certified advanced practice chiropractic physician[.]"  Section 61-4-2(C).  It does not, however, define "drug" or "substance" for the purposes of the Chiropractic Physician Practice Act.  At oral argument, the Chiropractic Board and the Pharmacy Board both indicated that the Chiropractic Physician Practice Act uses the terms "drug" and "substance" interchangeably.  By virtue of this interchangeable use, we do not make any distinction between "drug" and "substance" in the language of the Chiropractic Physician Practice Act.  *Cf. Hanson v. Turney*, 2004-NMCA-069, ¶ 12, 136 N.M. 1, 94 P.3d 1 (stating that, when the Legislature was aware of a distinction used in other statutes and did not adopt it, it intended otherwise).

{20}    When we then turn to the language of the third sentence of Section 61-4-9.2(B), and focus only on "drugs for administration by injection," we observe no lack of clarity in the requirement that a formulary that includes "drugs for administration by injection" or "substances not found in Subsection A" be approved by the Pharmacy and Medical Boards.  The Chiropractic Board, however, contends in its brief that, in context, the second and third sentences are confusing and do not permit such an isolating focus.  In particular, it argues that a reading of Section 61-4-9.2(B) that addresses the first two sentences as establishing the Chiropractic Board's authority to develop and approve formularies and the third sentence as limiting that authority does not make sense and renders statutory language duplicative or surplusage.

{21}    In order to address these arguments, we must consider the other types of drugs the Legislature listed in the third sentence.  Because the Chiropractic Physician Practice Act does not define these terms, we look elsewhere for guidance.  *See Janet*, 2013-NMCA-037, ¶ 11 ("The statute itself does not define [the term], so we look to case law and other statutes for guidance.").  "Dangerous drugs" and "controlled substances" are defined in the context of laws that similarly address regulated drugs.  "Controlled substances" are defined in the schedules of the Controlled Substances Act, NMSA 1978, §§ 30-31-1 to -41 (1972, as amended through 2011), and are subject to regulation by the Pharmacy Board.  Controlled substances are also defined in the New Mexico Drug, Device and Cosmetic Act by reference to the Controlled Substances Act.  NMSA 1978, § 26-1-2(D) (2011).  As defined in the New Mexico Drug, Device and Cosmetic Act, a "drug" is an article "recognized in an official compendium" that is "intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease."  Section 26-1-2(E)(1), (2).  Also as defined in the New Mexico Drug, Device and Cosmetic Act, a "dangerous drug" is

> a drug, other than a controlled substance enumerated in Schedule I of the Controlled Substances Act, that because of a potentiality for harmful effect or the method of its use or the collateral measures necessary to its use is not

8

safe except under the supervision of a practitioner licensed by law to direct
the use of such drug.

Section 26-1-2(F).

**{22}** These definitions were in place when the Legislature amended Section 61-4-9.2 in 2009. Although the Legislature did not specifically refer to the New Mexico Drug, Device and Cosmetic Act or the Controlled Substances Act for definitions, as it could have, it had already linked the New Mexico Drug, Device and Cosmetic Act to the Chiropractic Physician Practice Act by mandating coordination between the Chiropractic Board and the Pharmacy Board, which oversees the operation of the New Mexico Drug, Device and Cosmetic Act. *See* NMSA 1978, § 61-11-6(1), (9) (2005). Moreover, we believe that the Legislature intended the use of the New Mexico Drug, Device and Cosmetic Act and Controlled Substances Act definitions to apply because it used the terms "dangerous drugs" and "controlled substances" that are clearly defined in those acts. "Controlled substance" does not have meaning without reference to the Controlled Substances Act that defines it. *See Gutierrez v. J & B Mobile Homes*, 1999-NMCA-007, ¶ 8, 126 N.M. 494, 971 P.2d 1284 (applying "a common sense interpretation to the plain language of the statute"). In addition, when interpreting a statute, we seek to harmonize statutes involving the same or similar subject matter. *See Sinclaire v. Elderhostel, Inc.*, 2012-NMCA-100, ¶ 14, 287 P.3d 978 (stating that "[w]hen two statutes cover the same subject matter, we attempt to harmonize and construe them together in a way that facilitates their operation and the achievement of their goals" (alteration in original) (internal quotation marks and citation omitted)). Under the definition of "dangerous drugs" in the New Mexico Drug, Device and Cosmetic Act, we agree with the Pharmacy and Medical Boards that a drug that is administered by injection falls within the definition because it is not safe unless it is administered under the supervision of an appropriately licensed practitioner.

**{23}** Returning to the Chiropractic Board's arguments, it first contends that if the Legislature had intended the third sentence to be a limitation of the second sentence, "it would have been clearer if the [L]egislature had expressly added the phrase 'shall be submitted to the [Pharmacy Board] and Board of Medicine' to the end of the second sentence." The Legislature had used this approach in 2008 and removed this language in 2009. While this approach may have more directly stated the legislative intent, we do not second guess the approach the Legislature utilized. *See Marckstadt v. Lockheed Martin Corp.*, 2010-NMSC-001, ¶ 31, 147 N.M. 678, 228 P.3d 462 (stating that this Court "will not second-guess" the method chosen by the Legislature). Although the adopted approach may be more indirect because of the need to reference the New Mexico Drug, Device and Cosmetic Act, we do not consider it to be ambiguous. *See Bd. of Educ. for Carlsbad Mun. Sch.*, 1999-NMCA-156, ¶ 18 ("A statute is ambiguous if reasonably informed persons can understand the statute as having two or more meanings."). We also do not consider this approach to render the second sentence of Section 61-4-9.2(B) surplusage. As we have expressed, the second sentence granted the authority to the Chiropractic Board to adopt a formulary for drugs administered by injection, and the third sentence required the

9

Chiropractic Board to submit such a formulary to the Pharmacy and Medical Boards for approval.

**{24}**     The Chiropractic Board's second argument asserts that, under a construction in which the third sentence of Section 61-4-9.2(B) limits the second sentence, the legislative use of the phrase "drugs for administration by injection" in the third sentence of Section 61-4-9.2(B) duplicates the use of the term "[d]angerous drugs" earlier in the same sentence. We agree that there is overlap in the language because, as we have discussed, the term "dangerous drugs" includes drugs for administration by injection. Nevertheless, we do not consider this overlap to confuse the legislative intent. *See Bd. of Educ. for Carlsbad Mun. Sch.*, 1999-NMCA-156, ¶ 16 ("The primary purpose of statutory interpretation is to ascertain and give effect to legislative intent." (internal quotation marks and citation omitted)). Drugs administered by injection are a subset of "dangerous drugs." While the Legislature could have excluded drugs administered by injection, or used other language such as "dangerous drugs, including drugs for administration by injection," we do not believe that separately listing such drugs alters the legislative intent. We could not construe the separate listing as surplusage unless we attached a different meaning either to "drugs for administration by injection" or to "dangerous drugs." However, we do not perceive a meaning that is different from those we have discussed for either term, and the Chiropractic Board has not asserted that there is a different meaning for the terms.

**{25}**     The Chiropractic Board's oral argument position does not affect our analysis because we read the third sentence of Subsection B as an overarching requirement with respect to the formularies required by the first two sentences. "[S]ubstances not listed in Subsection A" is but a single category requiring approval. The language used distinguishes the category from the substances listed in Subsection A. But, particularly in view of the interchangeability of the terms "drugs" and substances" in the Chiropractic Physician Practice Act, we do not consider the use of the language to have greater meaning. To the extent that "substances in Subsection A" are also "dangerous drugs" or "drugs administered by injection," they fit within the specific categories identified in the third sentence of Subsection B.

**{26}**     When we thus read Section 61-4-9.2 both in connection with the history and other provisions of the Chiropractic Physician Practice Act and the definitions of the New Mexico Drug, Device and Cosmetic Act, which is a similar exercise of the Legislature's police power to protect the health and safety of its citizens, the meaning of the third sentence of Section 61-4-9.2(B) is clear. In creating the advanced practice chiropractic physician, the Legislature's primary purpose was to protect the public health and safety. Seemingly because of the existing authority and purpose of the Pharmacy and Medical Boards to protect the public health and safety concerning the prescribing and administering of drugs, the Legislature mandated a coordinated effort among the Chiropractic, Pharmacy, and Medical Boards to fulfill its purpose. It linked the Chiropractic Board to the Medical Board in developing a special educational requirement for advanced practice chiropractic physicians. It further required, in Section 61-4-9.2(B), that the Pharmacy and Medical Boards approve

the use of dangerous drugs and drugs for administration by injection, among others. The Legislature has adopted similar coordinated efforts for other health professionals. See NMSA 1978, Section 61-9-17.2(B) (2002) (requiring the State Board of Psychologist Examiners and the Board of Medical Examiners to jointly develop guidelines concerning a psychologist's prescribing of psychotropic medication); NMSA 1978, Section 61-3-23.3(E) (2001) (requiring the Board of Nursing to develop a formulary for prescriptive authority of certified registered nurse anesthetists in collaboration with the Board of Medical Examiners).

**{27}** In 2008, the legislative language left no room to question the need for the Pharmacy and Medical Boards to approve the Chiropractic Board's formularies. Although the 2009 amendment modified the language of Section 61-4-9.2, we do not believe that it modified the Legislature's mandate that the Pharmacy and Medical Boards approve the Chiropractic Board's formularies that it considered necessary for the protection of the public health and safety. In 2009, the Legislature relaxed its requirement that the Chiropractic Board submit all formularies to the Pharmacy and Medical Boards for approval. However, using terms with which it was familiar because of their use in the New Mexico Drug, Device and Cosmetic Act and the Controlled Substances Act, the Legislature required approval for, among other drugs and substances, dangerous drugs. By using this term, the Legislature intended to follow the established definition in the New Mexico Drug, Device and Cosmetic Act. Otherwise, the Legislature would have created an ambiguity, or worse, a new, conflicting definition, a result that we do not believe that it intended. *See Bd. of Educ. for Carlsbad Mun. Sch.*, 1999-NMCA-156, ¶ 18 ("A statute is ambiguous if reasonably informed persons can understand the statute as having two or more meanings.").

**{28}** In summary, we read Section 61-4-9.2(B) to authorize the Chiropractic Board to develop and approve formularies to permit an advanced practice chiropractic physician to prescribe and administer the substances listed in Subsection A. The formularies may include both topical and oral administration and administration by injection. However, the Chiropractic Board must submit its formularies to the Pharmacy and Medical Boards for approval to the extent that the formularies include dangerous drugs, as defined in the New Mexico Drug, Device and Cosmetic Act. As defined in the New Mexico Drug, Device and Cosmetic Act, dangerous drugs include drugs for administration by injection.

**Re-Punctuation**

**{29}** The Chiropractic Board differs with this interpretation and would have us re-punctuate the third sentence of Section 61-4-9.2(B) to adopt what it argues is the legislative purpose. According to the Chiropractic Board, Dr. Stephen Perlstein and Dr. Robert Jones, proponents of the 2009 amendment, testified at the rulemaking hearing that the intent of the 2009 amendment was to distinguish natural substances from all others and that there was no debate as to whether the Chiropractic Board had oversight over the natural substances. These natural substances are the ones listed in Subsection A. The proponents intended the amendment to enable the Chiropractic Board to oversee the dispensing of the Subsection A substances without approval of the Pharmacy Board and the Medical Board. They believed

11

that they had worked out the third sentence to read: "Dangerous drugs or controlled substances and drugs for administration by injection not listed in [Subsection] A shall be submitted to the [Pharmacy Board] and the [Medical Board] for approval." The Chiropractic Board contends in this appeal that this interpretation is consistent with the second sentence that allows it to develop a formulary for the substances of Subsection A to be administered by injection without approval by the Pharmacy and Medical Boards. Dr. Perlstein testified at the rulemaking hearing that a drafter at the Legislative Council Service modified this language by placing a comma after "dangerous drugs or controlled substances" that set off "dangerous drugs or controlled substances" and changed the meaning of the intended language.

**{30}** The Chiropractic Board suggests two ways in which this Court could alter the third sentence of Section 61-4-9.2(B) to achieve the substance that it contends was intended. First, it suggests that the emphasis of the third sentence should be on the language "not listed in Subsection A" such that "not listed in Subsection A" modifies all three items covered in the sentence, "[d]angerous drugs or controlled substances," "drugs for administration by injection," and "substances." To capture this emphasis, the Chiropractic Board suggests that we modify the third sentence to delete the comma after "controlled substances" and insert "and" in its place. The suggested sentence would read:

> Dangerous drugs or controlled substances and drugs for administration by injection and substances not listed in Subsection A of this section shall be submitted to the [Pharmacy Board] and the [Medical Board] for approval.

Alternatively, the Chiropractic Board suggests that we re-punctuate the third sentence to add a comma before and after "not listed in Subsection A of this section" so that "not listed in Subsection A of this section" will modify all other items listed in the sentence. The sentence would thus read:

> Dangerous drugs or controlled substances, drugs for administration by injection and substances, not listed in Subsection A of this section, shall be submitted to the [Pharmacy Board] and the [Medical Board] for approval.

**{31}** We find the Chiropractic Board's suggestions to be problematic for four reasons. First, it is not the realm of this Court to re-write a statute to comport with our opinion as to the manner it should be interpreted. *See Martinez v. Sedillo*, 2005-NMCA-029, ¶ 7, 137 N.M. 103, 107 P.3d 543 ("We will not rewrite a statute."). The Chiropractic Board relies on a single case, *Roswell*, 1942-NMSC-011, ¶ 4, 45 N.M. 116, 112 P.2d 505, to support its position. In that case, our Supreme Court observed from the face of a city ordinance that a word was incorrectly used. *Id.* ¶ 2. It considered the error to be clerical and substituted a word and a comma that was also used in a parallel clause in the ordinance. *Id.* As the Court pointed out, "[w]hen the ordinance is read as a whole, there can be no question as to its intended meaning." *Id.* ¶ 3. In this case, there is no apparent clerical error in the Section 61-

4-9.2(B) as written that frustrates the intended meaning.

**{32}** Second, the Chiropractic Board rests its argument on the testimony of Drs. Perlstein and Jones concerning the Legislature's intent in amending Section 61-4-9.2. New Mexico courts look primarily to the legislation itself to ascertain legislative intent. *Regents of the Univ. of N.M. v. N.M. Fed'n of Teachers*, 1998-NMSC-020, ¶ 30, 125 N.M. 401, 962 P.2d 1236. As a general rule, the Legislature "speaks solely through its concerted action as shown by its vote." *U.S. Brewers Ass'n, Inc. v. Dir. of the N.M. Dep't of Alcohol Beverage Control*, 1983-NMSC-059, ¶ 9, 100 N.M. 216, 668 P.2d 1093 (emphasis, internal quotation marks, and citation omitted). Although contemporaneous documents presented to the Legislature or statements of legislators made while legislation is pending may be considered to bear upon legislative intent, our courts do not generally consider statements of legislators or others after legislation has passed. *State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 35, 117 N.M. 346, 871 P.2d 1352; *Claridge v. N.M. State Racing Comm'n*, 1988-NMSC-056, ¶¶ 24, 28, 107 N.M. 632, 763 P.2d 66. Moreover, Drs. Perlstein and Jones testified at the rulemaking hearing about their intent as proponents of the 2009 amendment, not about the Legislature's intent.

**{33}** Third, notwithstanding the testimony of Drs. Perlstein and Jones, the Chiropractic Board asks that we re-write Section 61-4-9.2(B) to adopt a meaning that was not clearly the intent of the Legislature. As we have earlier discussed, the history and background of the Chiropractic Physician Practice Act support the requirement that the Pharmacy and Medical Boards approve formularies that contain dangerous drugs.

**{34}** Last, the Chiropractic Board's suggested alterations to the third sentence do not persuade us that the Legislature intended Pharmacy and Medical Board approval to apply only to substances not listed in Subsection A. In its first suggestion, the words "not listed in Subsection A of this section" are not separated from the immediately previous word "substances" so as to indicate that they refer to any items other than "substances." *See Hale v. Basin Motor Co.*, 1990-NMSC-068, ¶ 9, 110 N.M. 314, 795 P.2d 1006 (stating the doctrine of the last antecedent as "[r]elative and qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding, and are not to be construed as extending to or including others more remote" (internal quotation marks and citation omitted)). In the alternative suggestion, the word "substances" placed before a comma and the words "not listed in Subsection A of this section" do not make sense without a further descriptor or modifier. Each of the other references to drugs or substances in the sentence is more specifically described.

**THE ICA'S ARGUMENTS CONCERNING THE CHIROPRACTIC BOARD'S REGULATIONS**

**{35}** The ICA raises additional arguments on appeal concerning the Chiropractic Board's regulations. It contends that the Chiropractic Board's adoption of the 2011 formulary violated its own regulations, that the regulations require Medical Board approval for training

13

programs for advanced practice chiropractic physicians, and that the Chiropractic Board's prescribed training does not meet statutory and regulatory requirements. We consider the ICA's arguments in turn.

{36}    As to the adoption of the 2011 formulary, the ICA points to 16.4.15.7(E) NMAC, 16.4.15.8(A) NMAC (7/23/2010), and 16.4.15.8(H) NMAC. Regulation 16.4.15.7(E) of the Administrative Code defines "[c]hiropractic formulary" as "those substances that have been approved for use by the chiropractor registered in advanced practice by the [Chiropractic Board] and as by statute with consensus between the [Medical Board] and [Pharmacy Board]." Regulation 16.4.15.8(A) of the Administrative Code provides in part that actively registered chiropractic physicians "are allowed prescription authority that is limited to the current formulary as agreed on by the [Chiropractic Board] and as by statute, by the [Pharmacy Board] and the [Medical Board]." Regulation 16.4.15.8(H) of the Administrative Code addresses amendments to advanced practice formularies. It permits the Chiropractic Board to review the formularies annually for necessary amendments and further provides that all amendments "be made following consensus of the [Medical Board], [the Pharmacy Board] and the [Chiropractic Board]." 16.4.15.8(H) NMAC. The ICA argues that these regulations read together "all provide that any expansion of the chiropractic formulary must be made by consensus of all three boards."

{37}    On their face, 16.4.15.7(E) NMAC and 16.4.15.8(A) NMAC do not go as far as the ICA argues. Both require the involvement of the Pharmacy and Medical Boards "as by statute." By this express language, the regulations do not require any more than what is required by statute.

{38}    Regulation 16.4.15.8(H) of the Administrative Code requires the consensus of the Chiropractic Board and the Pharmacy and Medical Boards for an amendment to advanced practice formularies. The adoption of the 2011 formulary amended the previous formulary. 16.4.15.11 NMAC. Although it appears that the Chiropractic Board may be acting in a manner that is inconsistent with this regulation, we need not address this argument in view of our holding that the Chiropractic Board is statutorily required to obtain the Pharmacy and Medical Board's approval of the formulary to the extent it includes dangerous drugs.

{39}    The ICA's remaining arguments concern the Chiropractic Board's adoption of 16.4.15.12 NMAC, the training rule pertaining to the educational requirements of advanced practice chiropractic physicians. The Medical Board objected to 16.4.15.12 NMAC, stating that because the hours of training do not appear to be sufficient, it would "continue to disapprove all injectables until adequate training is proposed and agreed to by the" Medical Board. Section 61-4-9.1(D) requires an advanced practice chiropractic physician to have "completed a minimum of ninety clinical and didactic contact course hours" in specified subjects "from an institution of higher education approved by the [Chiropractic Board] and the [Medical Board]." Regulation 16.4.15.7(D) of the Administrative Code similarly requires that "[a]ny educational institution allowed to provide clinical and didactic programs credited toward advanced practice certification must have concurrent approval from the

14

[Medical Board] and the [Chiropractic Board]." Regulation 16.4.15.8(B)(2) of the Administrative Code provides that a chiropractic physician applying for advanced chiropractic physician registry must submit documentation of the completion of the specified ninety hours of education "provided by an institution approved by the [Medical Board] and the [Chiropractic Board]." We find no fault with the training rule.

**{40}** These provisions require the Medical Board to approve the institutions of higher education that provide the minimum of ninety specified educational hours to an advanced practice chiropractic physician. They do not give the Medical Board authority to decline any other type of approval. The ICA's position that the Medical Board could object to the formulary because it did not believe that the educational rule provided sufficient training is not supported by the statute and regulations it cites. As a result, the approval of higher education requirements by the Medical Board will not translate into a justification to reject separate "drug or substance" formularies proposed by the Chiropractic Board. The issues are distinct and we reject this argument by the ICA.

**CONCLUSION**

**{41}** We hold that the 2011 formulary that includes minerals and additional drugs to be administered by injection violates Section 61-4-9.2(B)'s requirement that the formula receive approval from the Pharmacy Board and the Medical Board. We find no fault with the training rule. Accordingly, we set aside the 2011 formulary.

**{42}   IT IS SO ORDERED.**

_____
**JAMES J. WECHSLER, Judge**

**WE CONCUR:**

_____
**TIMOTHY L. GARCIA, Judge**

_____
**J. MILES HANISEE, Judge**

**Topic Index for _Int'l Chiropractors Ass'n v. N.M. Bd. of Chiropractic Exam'rs_, Nos. 31,690/31,668**

**ADMINISTRATIVE LAW AND PROCEDURE**
Administrative Law, General
Legislative Intent

**APPEAL AND ERROR**
Standard of Review

**GOVERNMENT**
Licensing

**STATUTES**
Interpretation
Legislative Intent