The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: July 11, 2022

**No. A-1-CA-37878**

**MAILE SOON,**

   Petitioner-Appellee,

v.

**JEANNINE KAMMANN,**

   Respondent-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Gerard J. Lavelle, District Judge**

Thomas C. Montoya
Albuquerque, NM

for Appellee

ACLU of NM Foundation
Elinor Rushforth, Staff Attorney
Maureen A. Sanders, Cooperating Attorney
Albuquerque, NM

for Appellant

**OPINION**

**DUFFY, Judge.**

{1}     As part of their divorce proceedings, Maile Soon and Jeannine Kammann engaged in a protracted dispute over Kammann's parentage of twin children conceived via artificial insemination and delivered by Soon during the parties' marriage. Soon challenged Kammann's standing to adjudicate parentage under the New Mexico Uniform Parentage Act (NMUPA), NMSA 1978, §§ 40-11A-101 to -903 (2009, as amended through 2021), because Kammann was not biologically or genetically related to the children. Soon also argued that Kammann did not consent to Soon's insemination procedure as required to establish parentage under the NMUPA's assisted reproduction provisions. The district court ruled in favor of Soon and adjudicated Kammann not to be a parent of the children.

{2}     We address two questions presented by Kammann's appeal: (1) whether undisputed evidence that Kammann shares no genetic relationship with the children is sufficient to rebut the statutory presumption of parentage that arises when children are born during the marriage; and (2) whether the statutory requirements to establish parentage by consent to assisted reproduction limit the evidence a district court may consider to only those written records signed for the specific procedure that resulted in the pregnancy. We conclude that the answer to both questions is no and reverse.

## BACKGROUND

{3}     Soon and Kammann were married in September 2015. They shared a mutual desire to have children and sought to conceive a child through artificial insemination. Beginning approximately one month before their marriage, Soon underwent the first of several artificial insemination procedures. She successfully conceived twins in the summer of 2016. The couple began having troubles in their relationship, and Soon moved out of their shared home in November 2016. While still pregnant, Soon filed a petition for divorce on January 12, 2017, along with a motion for a referral to mediation for custody, visitation, and child support.

{4}     Soon gave birth on March 3, 2017. Over the next eighteen months, Soon and Kammann fought a contentious custody battle over the children. Soon initially conceded that Kammann was a parent of the children, and the two enacted a child support and visitation plan. They adhered to the plan for a time, and Kammann paid Soon biweekly child support until at least September 2018.[1]

{5}     Six months after initiating the proceedings, Soon hired a new attorney who filed a motion to dismiss Kammann's custody claim for lack of standing. As relevant to this appeal, Soon argued that Kammann lacked standing to adjudicate parentage under the NMUPA. Soon acknowledged that Kammann was presumed to be a parent

---

[1]The district court adjudicated Kammann not to be a parent of the children in September 2018.

of the children because they were born during the parties' marriage. *See* § 40-11A-204(A) (establishing the presumption of parentage that arises from marriage). Nevertheless, Soon argued that the marital presumption was conclusively rebutted because Kammann had no genetic relation to the children.

{6}     Kammann responded that the fact the children were born within the marriage "in and of itself establishes her basis for standing as an interested party under the Uniform Parentage Act." She also maintained that she is a parent of the children because she consented to the assisted reproduction under Section 40-11A-703 (stating that a person who "consents to assisted reproduction . . . with the intent to be the parent of a child is a parent of the resulting child"). She concluded that these facts establish that she "is not only an interested person, but is the presumed parent by virtue of her legal marriage to [Soon], and has standing to ask for a determination of parentage, custody and time-sharing" under New Mexico law.

{7}     The district court conducted an hour-long evidentiary hearing on Soon's motion and found that Kammann did not gave birth to the children, was not the genetic or biological mother of the children, and that the presumption of parentage based upon the parties' marriage had been rebutted. However, the court acknowledged that there was an outstanding issue as to whether Kammann had consented to the assisted reproduction and ordered that she would have thirty days to file a counter-petition to establish parentage based on the NMUPA's assisted

reproduction provisions. *See* §§ 40-11A-701 to -707. After Kammann did so, the district court held another evidentiary hearing, during which the parties presented witnesses and documentary evidence regarding their multiple attempts to conceive via artificial insemination. The court delivered its decision on the record four weeks later. Reasoning that Kammann "had to consent to the assisted reproduction that *resulted in the birth of the children*" to establish parentage, the court focused on whether Kammann had provided a record showing that she consented to the specific insemination procedure that resulted in conception. The court noted that the parties had attempted to conceive via artificial insemination several times and while "[t]here was a general consent filed by the parties early on" and both parties had signed documents in conjunction with several of the procedures, only Soon had signed the form for the procedure that was ultimately successful. For that reason, the court found that Kammann had not provided a signed record that complied with New Mexico law and concluded she was not a parent of the children. Afterward, Kammann filed a motion for visitation rights based on a theory of stepparent visitation, which the court also denied.[2] Kammann appeals.

---

[2]In the same order, dated December 4, 2018, the district court also granted a dissolution of marriage.

4

**DISCUSSION**

{8}    Kammann challenges two aspects of the district court's interpretation and application of the NMUPA. First, she contends that the NMUPA contains specific evidentiary and procedural requirements to rebut a presumption of parentage, and the district court failed to follow them here. Second, she challenges the district court's interpretation of the consent to assisted reproduction requirements, arguing the court took too narrow a view in requiring a document signed immediately before the specific insemination that resulted in conception. Resolution of these issues requires us to interpret the NMUPA.

{9}    "Statutory interpretation is an issue of law, which we review de novo." *Chatterjee v. King*, 2012-NMSC-019, ¶ 11, 280 P.3d 283 (internal quotation marks and citation omitted). When reviewing a statute, we seek to give effect to the Legislature's intent. *Id.* In determining legislative intent, "we look first to the plain language of the statute, giving the words their ordinary meaning, unless the Legislature indicates a different one was intended." *Id.* (alteration, internal quotation marks, and citation omitted). In addition to the statute's plain language, we will consider its history, background, and the broader statutory scheme within which the language being interpreted rests. *Id.* ¶ 12. We do so to ensure a harmonious interpretation of statutory language within a given act. *Id.*

## I.  The Marriage Presumption

{10}  We turn first to Kammann's argument that the district court erred in concluding her presumed parentage had been rebutted. Kammann challenges the district court's ruling on evidentiary, procedural, and constitutional grounds. She argues that (1) Soon did not present admissible results of genetic testing as required by statute to rebut the presumption; (2) by not requiring genetic testing results, the district court bypassed important procedural aspects of the NMUPA that allow the court to consider whether genetic testing is appropriate in the first place; and (3) the genetic testing provision, as applied, violates the Fourteenth Amendment's Equal Protection Clause. We agree that evidentiary and procedural errors require reversal in this case. Consequently, we do not reach the constitutional question. *See Allen v. LeMaster*, 2012-NMSC-001, ¶ 28, 267 P.3d 806 (noting that "[i]t is an enduring principle of constitutional jurisprudence that courts will avoid deciding constitutional questions unless required to do so" and that "courts exercise judicial restraint by deciding cases on the narrowest possible grounds" (internal quotation marks and citation omitted)); *see also Lovelace Med. Ctr. v. Mendez*, 1991-NMSC-002, ¶ 12, 111 N.M. 336, 805 P.2d 603 ("It is, of course, a well-established principle of statutory construction that statutes should be construed, if possible, to avoid constitutional questions.").

{11}     Under the NMUPA, a presumption of paternity arises when a child is born during a marriage. Section 40-11A-204(A)(1). While the NMUPA uses the term "paternity," the Legislature made clear that "[p]rovisions of the [NMUPA] relating to determination of paternity apply to determinations of maternity insofar as possible." Section 40-11A-106; *see Chatterjee*, 2012-NMSC-019, ¶ 20 (discussing the gender neutrality provision in the prior version of the NMUPA and concluding the presumptions of paternity apply to women). Accordingly, married persons of any gender may rely on the marriage presumption to establish standing and a presumption of parentage. *See* § 40-11A-602 (stating that a person whose parentage of the child is to be adjudicated has standing to maintain a proceeding under the NMUPA); *Griego v. Oliver*, 2014-NMSC-003, ¶ 6, 316 P.3d 865 (recognizing that "the State of New Mexico is constitutionally required to allow same-gender couples to marry"); *see also Chatterjee*, 2012-NMSC-019, ¶ 9 (construing the prior version of the NMUPA to afford standing to "[a]ny person who is able to establish presumed natural parenthood").

{12}     An unrebutted presumption of parentage conclusively establishes the parent-child relationship. *See* § 40-11A-201(B)(1). In contested cases, a presumption may only be rebutted by an adjudication pursuant to Article 6 of the NMUPA. Section 40-11A-204(B); *see also* § 40-11A-601 (authorizing civil proceedings in the district court to adjudicate the parentage of a child). The Legislature specified rules for the

7

adjudication that state, in relevant part, "[t]he paternity of a child having a presumed . . . father may be disproved *only by admissible results of genetic testing* excluding that man as the father of the child or identifying another man as the father of the child." Section 40-11A-631(A) (emphasis added). Read together and in a gender-neutral fashion, Sections 40-11A-204 and -631(A) establish that Kammann is presumed to be a parent of the children by virtue of their birth during her marriage to Soon.[3] This presumption can only be rebutted by the admission of genetic testing results showing that Kammann has no genetic relation to the children.

{13}    This brings us to the crux of the parties' dispute: whether the district court erred in concluding that the marriage presumption had been rebutted when neither party sought or offered "admissible results of genetic testing." Soon relied instead on Kammann's admission under oath that she is not the genetic or biological parent of the children. We must therefore determine whether an admission alone can satisfy the evidentiary requirement in Section 40-11A-631(A).

{14}    Soon argued below that genetic testing should only be required if there is some doubt as to whether Kammann was the genetic parent. She maintains on appeal that "any presumption of parentage due to marriage is indisputably rebutted by evidence that a parent cannot be a biological parent of the child at issue, and by the fact of

[3]Throughout the remainder of this opinion, we use the term "presumed parent" in place of "presumed father."

8

artificial insemination." She concludes that because there is no dispute that Kammann is not the genetic parent of the children, Kammann's admission was sufficient to rebut the marriage presumption as a matter of law.

{15} Kammann argues that the evidentiary requirement to rebut the marriage presumption is governed by statute and an admission does not satisfy the statute's requirement. *See* § 40-11A-631. Kammann notes that genetics are not necessarily dispositive of parentage under the NMUPA. Under some circumstances, the district court may forgo genetic testing and adjudicate the presumed parent to be the parent of the child. *See* § 40-11A-608. That procedure, Kammann argues, is triggered by a genetic testing request and a strict interpretation of the evidentiary requirement is necessary to protect the rights of the presumptive parent. Based on the NMUPA's plain language, history, and purpose, we agree that the evidentiary requirement must be applied strictly.

{16} We look first to the plain language of the statute as the primary indicator of legislative intent. *Chatterjee*, 2012-NMSC-019, ¶ 11. In Section 40-11A-631, the Legislature stated that "[t]he district court *shall* apply the following rules to adjudicate the [parentage] of a child." (Emphasis added.) When a child has a presumed parent, parentage "may be disproved *only* by admissible results of genetic testing." Section 40-11A-631(A) (emphasis added). The Legislature's use of the word "only" is restrictive, and a straightforward reading of the evidentiary

requirement in Section 40-11A-631 is that genetic testing is the sole type of evidence to be considered when disproving a parentage presumption.

{17}     This view finds support in the history of the NMUPA, in how Section 40-11A-631 functions in conjunction with other provisions in the NMUPA, and in the overarching public policy goals that animate the NMUPA. Under the prior version of the NMUPA, our Supreme Court recognized in *Chatterjee* that biology does not automatically rebut a presumption of parentage. *See* 2012-NMSC-019, ¶¶ 38-47. In that case, a woman sought joint custody of a child adopted by her partner during the course of their long-term domestic relationship. *Id.* ¶ 1. She alleged that she was a presumed natural parent of the child under the NMUPA and filed a petition to establish parentage in the district court. *See id.* ¶ 2. As an issue of first impression, our Supreme Court held that the presumptions of paternity set forth in NMSA 1978, Section 40-11-5 (1997, repealed 2009) operated in a gender-neutral fashion such that a woman could rely on the paternity presumptions to establish standing and parentage under the NMUPA. *See Chatterjee*, 2012-NMSC-019, ¶¶ 9, 48-49.

{18}     In an in-depth analysis that bears on our decision here, the Court considered the statutory mechanism for rebutting a presumption of parentage. *Id.* ¶¶ 38-47. The Court evaluated whether it was appropriate to rebut a presumption of parentage with evidence that the petitioner was not the biological parent of the child. *Id.* The Court observed that the presumptions arose from a person's conduct, not a biological

connection, *id.* ¶ 15, and rejected the notion that a presumed parent's admission that he or she was not the child's biological parent conclusively rebuts the presumption. *See id.* ¶¶ 41-47 (stating that district courts should not determine parentage solely on the basis of a biological relationship); *see also id.* ¶ 44 (noting that the Colorado Parentage Act "does not elevate the presumption of biology over the presumption of legitimacy and nothing in the statutory provisions provides that an admission by a man that he is not the child's biological father conclusively rebuts a parentage presumption" (text only) (citation omitted)).[4]

---

[4]Soon's brief cites to this Court's opinion in *Lane v. Lane*, 1996-NMCA-023, ¶ 10, 121 N.M. 414, 912 P.2d 290, which stated that the marital presumption "was indisputably rebutted by evidence of [the h]usband's sterility and the [fact that the children were conceived via] artificial insemination." *Lane* was decided under the prior version of the Act and before our Supreme Court's opinion in *Chatterjee*, which made clear that whether biology should be allowed to rebut a presumption of parenthood is a fact-bound inquiry for the district court. Consequently, any suggestion in *Lane* that the marriage presumption is "indisputably" rebutted by evidence of the lack of a biological relationship must yield to *Chatterjee*'s holding that there is no bright-line rule. Further, there is no indication in *Lane* that either the district court or this Court considered whether that case was "an appropriate action" in which to rebut the marriage presumption, and therefore *Lane* offers no guidance on that question as a counterpoint to the analysis in *Chatterjee. Cf. Tran v. Bennett*, 2018-NMSC-009, ¶ 22, 411 P.3d 345 (holding that it was appropriate to rebut the presumption of paternity with biological evidence under the facts presented because doing so would not deprive the child of having the support of two parents or sever a close emotional bond between the child and a presumed father); *Fernandez v. Farmers Ins. Co. of Ariz.*, 1993-NMSC-035, ¶ 15, 115 N.M. 622, 857 P.2d 22 ("The general rule is that cases are not authority for propositions not considered." (internal quotation marks and citation omitted)).

**{19}** The Court noted that the Legislature had "limited the circumstances for rebuttal of the parentage presumption" by directing that a presumption should only be rebutted "*in an appropriate action*." *Chatterjee*, 2012-NMSC-019, ¶¶ 41-42. However, because the Legislature had not defined what constitutes an "appropriate action," the Court adopted a variety of factors from other jurisdictions with similar enactments to guide that determination. *See id.* ¶¶ 42, 47. These included whether there was a competing parentage claim by a third party, whether denying the presumed parent's claim would leave the child without a second parent, and whether the presumed parent had "actively participated in causing the children to be conceived with the understanding that she would raise the children as her own together with the birth mother." *Id.* ¶¶ 42-47 (internal quotation marks and citation omitted). The Court emphasized the importance of considering the child's best interests, *id.* ¶¶ 43-47, and stated unequivocally that district courts should not assume a genetic parentage determination is in the best interest of the child. *See id.* ¶ 46 (noting that determining parentage solely on the basis of a biological relationship may be detrimental to the child's welfare by compromising the continuity of an established relationship).

**{20}** The NMUPA was amended in 2009 and now contains express guidance on when and how genetics factor into parentage adjudications. The NMUPA sets forth the general rule that a person excluded as the parent by genetic testing would

12

normally be adjudicated not to be the parent of the child. *See* § 40-11A-631(D). But the Legislature carved out specific exceptions for adjudications involving a presumed parent. *See* § 40-11A-608. When a child has a presumed parent, parentage "*may* be disproved *only by admissible results of genetic testing.*" Section 40-11A-631(A) (emphases added). Importantly, the results of genetic testing are *not* admissible to adjudicate parentage unless performed with the consent of both parties or pursuant to a court order. *See* § 40-11A-621(C). Under the latter scenario, a party may file a motion to compel genetic testing, but the Legislature expressly provided that the district court may deny the motion and adjudicate the presumed parent to be the parent of the child. *See* § 40-11A-608(A). That course of action is authorized by statute if the district court determines by clear and convincing evidence that (1) the conduct of the mother or the presumed parent estops that party from denying parentage; and (2) it would be inequitable to disprove the presumed parent's relationship with the child. *See* § 40-11A-608(A), (D).[5] The district court must also

---

[5]Soon briefly mentions that Kammann did not preserve an argument that Section 40-11A-608 should apply in this case. This is true insofar as Kammann did not argue below that Section 40-11A-608 applies, but we do not view this as a failure of preservation. Rule 12-321(A) NMRA requires that issues must be preserved for our review. The *issue* presented here, whether the district court erred in concluding that the marital presumption had been rebutted in the proceedings below, was unquestionably preserved. Kammann's briefing on Section 40-11A-608 is merely argument directed to that issue; that is, Kammann does not appear to rely on Section 40-11A-608 in her briefing for any purpose other than to demonstrate the Legislature's intent that "under some circumstances, application of the Genetic-Testing Provision might be unfair." Soon has not provided us with any authority

13

consider the best interest of the child based on a nonexhaustive list of nine factors. *See* § 40-11A-608(B). Taken together, these provisions embody our Legislature's continued recognition that genetics do not conclusively rebut a presumption of parentage. *See Chatterjee*, 2012-NMSC-019, ¶¶ 35-36 (noting that children may form parent-child bonds with persons other than their genetic parents and that New Mexico courts have awarded custody to nongenetic parents in some circumstances).

{21} Allowing district courts to uphold a parent-child relationship even when a genetic relationship is absent is in keeping with the dual public policy goals that animate the NMUPA: the state's "strong interest in ensuring that a child will be cared for, financially and otherwise, by two parents," and "the interest that children have

---

demonstrating that a party cannot provide additional legal authority and argument on appeal in support of an issue preserved below.

We also agree with Kammann that the procedural posture in this case deprived her of an opportunity to raise Section 40-11A-608 before the district court ruled. Soon raised the issue of Kammann's "paternity" in a motion to dismiss for lack of standing. Standing under the Act is standing to adjudicate parentage. *See* § 40-11A-602; *Chatterjee*, 2012-NMSC-019, ¶ 49. The undisputed fact that the children were born during the parties' marriage was sufficient to establish Kammann's standing to maintain a proceeding to adjudicate parentage. *See* § 40-11A-602; § 40-11A-204(A)(1). To the extent Soon's motion also included a substantive argument on the merits of Kammann's parentage, and to the extent the evidentiary hearing on Soon's motion to dismiss for lack of standing functioned as a parentage adjudication, the ultimate ruling on the merits of Kammann's presumed parentage bypassed several procedural and evidentiary provisions required by Article 6. Soon neither presented admissible results of genetic testing nor filed a motion seeking to compel genetic testing to rebut Kammann's presumed parentage. Given this, we agree with Kammann that the improper procedure prevented her from opposing a motion for genetic testing by invoking the equitable protections of Section 40-11A-608.

14

in their own support." *Id.* ¶¶ 32-33. As to the state's interest, the *Chatterjee* Court observed that "parents have an obligation to support their children in any possible combination and permutation of marriage, method for conception of the child, and arrangements that intended parents make to have children," and when that care is lacking, the responsibility of caring for the child falls to the state. *Id.* ¶¶ 31-32 (omission, internal quotation marks, and citation omitted). As to the child's interest, the Court observed that a "[c]hild's need for love and support is no less critical simply because [his or] her second parent also happens to be a woman." *Id.* ¶ 34. Collectively, Sections 40-11A-631(A) and -608 give force to these overarching goals by allowing district courts to decide in each case whether the genetic relationship, or lack thereof, should be allowed to rebut a presumption of parentage.

{22}     The language, history, and purpose of the NMUPA lead us to conclude that the Legislature intended the evidentiary requirement for rebutting a parentage presumption to be applied strictly. Consequently, a parentage presumption cannot be rebutted in the absence of admissible results of genetic testing. Were it otherwise, parties could circumvent the district court's authority to deny a motion for genetic testing by eliciting an admission from the presumed parent that they have no genetic relationship with the child. In effect, if admissions were allowed to rebut the presumption in lieu of genetic testing results, then in any case where an admission is obtained, the lack of a genetic relationship would conclusively rebut a parentage

presumption, regardless of whether doing so served the best interests of the child. This is contrary to the intent expressed in the statutory framework and would undermine the fundamental considerations that underlie a parentage determination. Therefore, in line with our Supreme Court's reasoning in *Chatterjee*, we hold that a presumed parent's admission that they are not the genetic parent of the child is insufficient to rebut a parentage presumption. *See* 2012-NMSC-019, ¶¶ 43-47.

{23}   In this case, because neither party sought or presented genetic testing results, we reverse the district court's determination that the marriage presumption has been rebutted and remand for further proceedings.

## II.   Assisted Reproduction Provisions

{24}   Kammann next argues that she produced sufficient evidence to establish parentage under Sections 40-11A-201(B)(5) and -704, which provide that the parent-child relationship is established if Kammann consented to the assisted reproduction in a signed record. Kammann presented a variety of documents relating to multiple artificial insemination procedures beginning in August 2015.[6] The district court

---

[6]On August 18, 2015, Soon and Kammann both signed a form entitled "General Policy Statement and Consent." That same day, Soon signed a form entitled, "Consent for Artificial Insemination With Donor Sperm." Kammann did not sign that form. On November 30, 2015, the parties signed a form laying out the risks and complications that arise in multiple-birth pregnancies.

In addition to these forms, the record contains four documents chronicling Soon's artificial insemination procedures. The first three are entitled, "Sperm Wash Report," and include a patient attestation which states, "I (we) attest that I (we) give [consent] and permission for this processed sperm specimen as identified by me (us)

found that Kammann had not produced a signed consent specifically for the July 2016 procedure that resulted in Soon's pregnancy. For that reason, the district court concluded Kammann had failed to produce a signed record that complied with the requirements of the NMUPA, had failed to prove she consented to assisted reproduction, and was a not a parent of the children. On appeal, Kammann maintains that her evidence—a signed consent for Soon's August 2015 insemination procedure and three other signed forms related to later procedures—was sufficient to satisfy the statutory requirement. While Kammann frames the matter as a question of sufficiency of the evidence, the issue presented requires us to determine the scope of evidence a district court may consider under the NMUPA's consent requirements.

{25}     We begin with the statutory provisions that govern parentage by consent to assisted reproduction. The NMUPA states in Section 40-11A-201(B)(5) that the parent-child relationship is established by "the [person's] having consented to assisted reproduction by a woman pursuant to Article 7 of the [NMUPA] that resulted in the birth of the child." In Article 7, the NMUPA sets forth the requirements to establish consent. It states, "The intended parent or parents shall

---

to be utilized for the purpose of insemination for procreation." The reports are dated September 30, 2015, October 28, 2015, and January 22, 2016. Each sperm wash report is signed by Soon and Kammann. The final document is an "Andrology Report," which contains similar technical data to the sperm wash reports, but does not include the patient attestation. The form is dated July 13, 2016, and is only signed by Soon.

17

consent to the assisted reproduction in a record signed by them before the placement of the eggs, sperm or embryos." Section 40-11A-704(A); *see also* § 40-11A-703 ("A person who . . . consents to assisted reproduction as provided in Section 7-704 of the [NMUPA] with the intent to be the parent of a child is a parent of the resulting child.").[7]

{26}     The district court construed these provisions to mean that the signed consent must relate to the specific procedure that resulted in pregnancy and the eventual birth of the children. That interpretation effectively requires intended parents to sign a consent document before each placement in cases such as this, where the birth mother undergoes multiple placements before becoming pregnant. For a number of reasons, we view this restrictive construction as contrary to the Legislature's intent.

{27}     First, the plain language of the NMUPA is not so restrictive. The only time requirement bearing on the written consent is that it must occur "before the placement of the eggs, sperm or embryos." Section 40-11A-704(A). The NMUPA does not prohibit district courts from considering consent documents signed by the parties at any point before the final placement, nor does it expressly require a new consent before each placement when parties attempt assisted reproduction more than

---

[7]Section 40-11A-703 does not require a consenting person to provide genetic material or physically carry the pregnancy. This structure ensures that a nonbirthing spouse has a way to establish parentage that does not rely on a genetic or biological relationship to the child—a relationship that will be impossible to establish in assisted reproduction involving a third-party donor.

18

once before they successfully conceive. Rather than focusing on the *timing* of the parties' consent, the NMUPA focuses on the parties' *intent*—whether a person consented to assisted reproduction with the intent to be the parent of the resulting child. Section 40-11A-703. Given the absence of other restrictions, the NMUPA does not prevent consideration of any documents signed by the parties before they conceive via assisted reproduction, so long as those documents manifest their intent to be a parent of the resulting child.

{28}     The NMUPA also indicates that consent, once given, can remain effective for an extended period of time. Section 40-11A-706(B) governs the withdrawal of consent and implicitly recognizes that consent remains effective until it is withdrawn. *See* § 40-11A-706(B) ("Unless otherwise agreed in a signed record, the consent of a woman or man to assisted reproduction may be withdrawn by that person in a signed record delivered to the other person at any time before placement of eggs, sperm or embryos if the placement has not occurred within one year after the consent."). As a practical matter, if written consent were required before every placement, then a person would only be able to withdraw consent in the brief window of time between signing the consent form for the procedure and the ensuing performance of the procedure. While it is not *entirely* outside the realm of possibility that a person could change their mind in such a narrow window, the more reasonable view is that parties can manifest their intent and consent to the entire course of

assisted reproduction—whatever it entails and however many attempts are necessary—until the birthing mother conceives. *See Lane*, 1996-NMCA-023, ¶ 20 (observing that the writing requirement serves a "cautionary purpose" because "[o]ne who pauses to sign a document can be expected to give more thought to the consequences of consent than one who gives consent in a less formal setting").[8]

{29} Finally, we cannot ignore the practical and public policy implications of narrowly construing the consent provisions to require a signed document for the specific procedure that resulted in the pregnancy and birth. Such a formalistic requirement raises the possibility that a willing and intended parent may fail to satisfy the legal requirements to establish parentage for want of a single document, even if there is considerable written evidence to the contrary. What if, for example, the intended parent was unable to attend the appointment or arrived late, after the placement? What if the provider does not request a signature for that particular procedure or misplaces the form? In those circumstances, even if there was written consent to assisted reproduction *in general*, the intended parent would not be able to produce the evidence necessary to establish parentage. On the other side of the coin, this could also prevent a birth parent from establishing the other parent's obligation

---

[8] Soon contends that *she* did not desire Kammann to be the parent of the children at the time she conceived the children in July 2016. While she points to her own testimony as uncontradicted evidence that she had changed her mind, there is no evidence in the record that she communicated a withdrawal of consent to Kammann or her medical providers.

to help support the child. *E.g.*, *Chatterjee*, 2012-NMSC-019, ¶ 62 (Bosson, J., specially concurring). Such a result is not only impractical, it is in conflict with public policy underlying the NMUPA. *Id.* ¶¶ 32-33. As this Court observed when construing a similar provision in the prior version of the NMUPA, "when [spouses] both approve of . . . conceiving a child through artificial insemination and both wish [the nonbirthing spouse] to be treated as the natural [parent], then the [s]tate should honor that wish." *Lane*, 1996-NMCA-023, ¶ 20.

{30} For all of these reasons, we see no justification for limiting proof of consent to only those documents signed for the specific procedure that results in pregnancy. As this Court observed in *Lane*, the requirement of a signed record serves an evidentiary function, the purpose of which is to "avoid[] disputes regarding whether consent was actually given." *Id.* Like *Lane*, "[w]e fail to see how the date of the writing affects the probative value of the writing as evidence of the consent." *Id.* ¶ 22. We reverse the district court's contrary decision.

{31} On remand, the district court must consider whether the parties' written evidence establishes Kammann's consent to assisted reproduction. Because the Legislature has not prescribed the nature of the writing or any particular form of words for the consent, and because the purposes of the statute have not changed, the three factors articulated in *Lane* continue to provide a helpful framework for evaluating whether a writing is satisfactory: "if the writing conveys in some manner

21

that (1) the [nonbirthing spouse] knows of the conception by artificial insemination, (2) the [nonbirthing spouse] agrees to be treated as the lawful [parent] of the child so conceived, and (3) the [birthing spouse] agrees that the [nonbirthing spouse] will be treated as the lawful [parent] of the child." *Id.* ¶ 21. While the district court's oral ruling indicates that at least one of the parties' exhibits amounted to a general consent early on, the court did not make a finding on this point, and this Court cannot do so for the first time on appeal. *See State v. Gonzales*, 1999-NMCA-027, ¶ 9, 126 N.M. 742, 975 P.2d 355 ("It is a bedrock principle of appellate practice that appellate courts do not decide the facts in a case"); *see also Duke City Lumber Co. v. Terrel*, 1975-NMSC-041, ¶ 5, 88 N.M. 299, 540 P.2d 229 ("[I]t is for the finder of the facts, and not the appellate courts, to weigh conflicting evidence and decide where the truth lies.").

**CONCLUSION**

{32} For the foregoing reasons, the district court's orders regarding Kammann's parentage are reversed and this matter is remanded for further proceedings consistent with this opinion.

{33} **IT IS SO ORDERED.**

_____

**MEGAN P. DUFFY, Judge**

**WE CONCUR:**

_____
**J. MILES HANISEE, Chief Judge**

_____
**GERALD E. BACA, Judge**

23